1   NORMAN A. DUPONT (085008)
2   DAVID G. ALDERSON (231597)
    WHITNEY G. MCDONALD (245587)
3   RICHARDS, WATSON & GERSHON
    355 South Grand Avenue, 40th Floor
4   Los Angeles, CA 90071-3101
    Telephone: (213) 626-8484
5   Facsimile: (213) 626-0078
    E-mail: Ndupont@rwglaw.com



FILED
CLERK, U.S. DISTRICT COURT

APR - 1 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

6   Attorneys for Plaintiff,
7   BURBANK-GLENDALE-PASADENA AIRPORT AUTHORITY

8

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT**

9               **OF CALIFORNIA–WESTERN DIVISION**

10

           **CV10 2392 JFW PLAx**

11 BURBANK-GLENDALE-PASADENA   Case No.:
    AIRPORT AUTHORITY, a public
12 entity organized under the laws of the   **COMPLAINT FOR SPECIFIC**
    State of California,                **PERFORMANCE AND**
13                           **INJUNCTIVE RELIEF,**
        Plaintiff,                 **DECLARATORY JUDGMENT,**
14                         **AND FOR BREACH OF**
      vs.                       **CONTRACT**
15

16 LOCKHEED MARTIN          (1) SPECIFIC PERFORMANCE AND
    CORPORATION, a Delaware         INJUNCTIVE RELIEF (1978
17 corporation,                   AIRPORT PURCHASE
                         AGREEMENT);
18       Defendant.        (2) DECLARATORY JUDGMENT
                        (1978 AIRPORT PURCHASE
19                    AGREEMENT);
                   (3) BREACH OF CONTRACT (1978
20                  AIRPORT PURCHASE
                   AGREEMENT);
21               (4) SPECIFIC PERFORMANCE AND
                  INJUNCTIVE RELIEF (1980 C-1
22                AREA LEASE AGREEMENT);
               (5) DECLARATORY RELIEF (1980 C-
23               1 AREA LEASE AGREEMENT);
              (6) BREACH OF CONTRACT (1980 C-
24             1 AREA LEASE AGREEMENT);

25              [TRIAL BY JURY DEMANDED]

26

27

28

COMPLAINT

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW   A PROFESSIONAL CORPORATION

Plaintiff Burbank-Glendale-Pasadena Airport Authority complains and alleges, as follows:

## I. THE PARTIES, JURISDICTION AND VENUE

1.  Plaintiff Burbank-Glendale-Pasadena Airport Authority (the "Authority") is, and at all times mentioned herein, has been, a joint powers authority, duly organized and existing under and by virtue of the laws of the State of California, and located entirely within the boundaries of the County of Los Angeles, State of California. The Authority, originally known as the Hollywood-Burbank Airport Authority, was created in 1977 by a joint exercise of powers agreement, as subsequently amended, between the cities of Burbank, Glendale and Pasadena for the purpose of enabling said cities to exercise their powers jointly for the operation of a commercial airport on real property located principally in Burbank, California. The current name of the airport is the Bob Hope Airport.

2.  Defendant Lockheed Martin Corporation ("Lockheed" or "Defendant") is a corporation which is or was doing business and is or was a substantial property owner within the County of Los Angeles at all relevant times herein. The Authority is informed and believes and based thereon alleges that Lockheed is a Delaware corporation with its corporate office and principal place of business in Bethesda, Maryland.

3.  This court has jurisdiction in that complete diversity of citizenship exists between Plaintiff and Defendant and the amount in controversy involves more than $75,000, exclusive of interest and costs. Jurisdiction is therefore proper pursuant to 28 U.S.C. Section 1332.

4.  Venue is proper in this judicial district because the Property in question is located exclusively within this judicial district and the acts and contracts giving rise to the claims occurred in Los Angeles County. Venue is therefore proper pursuant to 28 U.S.C. Section 1391(a).

///

COMPLAINT

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW · A PROFESSIONAL CORPORATION

## II.  BACKGROUND

5.     The Authority acquired various parcels of real property located in the cities of Los Angeles and Burbank, California principally from Lockheed (collectively, the Property).  The Authority made these acquisitions through a series of real estate transactions and eminent domain acquisitions between 1978 and 2005.  The Authority has used the acquired property to operate a commercial airport for the public good.

6.     In its initial acquisition in 1978, the Authority acquired property from Lockheed Air Terminal, Inc. ("LAT"), a Delaware corporation and wholly owned subsidiary of Lockheed Corporation.  Both LAT and Lockheed Corporation issued separate written indemnities to the Authority.  By virtue of the 1995 corporate merger between Lockheed Corporation and Martin Marietta Corporation, the resulting entity, Lockheed Martin Corporation ("Lockheed"), assumed all of the legal liabilities of each individual merging entity, including the liability for responding to the indemnification issued to the Authority by Lockheed in 1978.

7.     In each of the subsequent acquisitions, with the exception of the acquisition of Lockheed's properties known as the C-1 and B-6 plants that were acquired through the Authority's exercise of its eminent domain power, the Authority received an indemnity from Lockheed covering "all claims" made against the Authority based upon Lockheed's prior ownership and operations at the Property.  The broad scope of each indemnification agreement issued by Lockheed covers environmental claims based upon Lockheed's former operations and ownership of the land purchased by the Authority.  Moreover, the 1995 merger of Lockheed Corporation and Martin Marietta Corporation legally resulted in the merged entity assuming liability for each of the indemnity agreements originally issued by Lockheed Corporation, LAT, or any other Lockheed subsidiary or division.

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW – A PROFESSIONAL CORPORATION

12285-0024\1215212v2.doc

### III.  EPA SENDS A LETTER ANNOUNCING THAT THE AUTHORITY IS A LIABLE PARTY FOR THE NORTH HOLLYWOOD OPERABLE UNIT

8.    On December 22, 2009, the United States Environmental Protection Agency ("EPA") Region 9 sent a letter ("EPA claim") notifying the Authority that EPA contends the Authority is a potentially responsible party for groundwater contamination in the San Fernando Valley Superfund Site, specifically the area generally described by EPA as the North Hollywood Operable Unit ("North Hollywood OU").

9.    EPA's letter requests that the Authority immediately begin negotiations with other potentially liable parties to perform or finance cleanup actions.  EPA's December 22, 2009 letter further indicated that EPA intended to send a more formal special notice letter in "early 2010" to the Authority and other potentially responsible parties listed in the letter.  EPA's list of potentially responsible parties totaled approximately 30 entities, including Lockheed.

10.    EPA's December 22, 2009 letter states that within 60 days of the forthcoming "special notice" letter, the parties will be required to submit a good faith settlement offer to the EPA pursuant to 42 U.S.C. § 9622(e)(2)(B).  EPA internal guidance memoranda require that a response to a "special notice" letter include specific and unqualified commitments to undertake the work that EPA recommends in its Feasibility Study.  EPA's July 2009 Focused Feasibility Study for the North Hollywood OU indicates the current estimated cost of its proposed interim remediation is $108 million.

///

///

///

///

///

COMPLAINT

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW · A PROFESSIONAL CORPORATION

## IV.  LOCKHEED'S FORMER OPERATIONS ARE THE EXCLUSIVE CAUSE FOR THE INCURRENCE OF RESPONSE COSTS IN THE NORTH HOLLYWOOD OPERABLE UNIT

11.    EPA's July 2009 Focused Feasibility Study for the North Hollywood OU, which estimated the cost for additional remedial action in that area at $108 million, contains figures that specifically refer to the former Lockheed B-5 and C-1 properties as "facilities of interest" in the North Hollywood OU.

12.    EPA contends the North Hollywood OU is contaminated with, among other chemicals of concern, industrial solvents such as trichloroethylene ("TCE"), perchloroethylene ("PCE"), and also with hexavalent chromium ("6-chrome").

13.    Lockheed released hazardous substances on the Property as a result of its operations when it owned and operated the Property.  Those hazardous substances (as defined in 42 U.S.C. §9601) have impacted the groundwater beneath both the C-1 and B-5 facilities.  Lockheed operated aircraft production and manufacturing operations at the various locations that it subsequently sold to (or were acquired by eminent domain by) the Authority, including but not limited to the A-1, B-6,  B-5 and C-1 plants.  During the 1940s, Lockheed built military aircraft for use by both the Royal Air Force and the then U.S. Army Air Corps, including the Hudson bomber and the P-38 fighter.  On information and belief, Lockheed continued the manufacture of military and other aircraft after World War II and into the late 1980s.  Those manufacturing facilities typically used solvents, including PCE and TCE, to clean machined aircraft parts.  In addition, at least the Lockheed plant A-1 had chromium plating tanks which were used as part of its operations.  EPA has named Lockheed as a 'potentially responsible party' in the North Hollywood OU.  EPA's Focused Feasibility Study of 2009 contained figures showing "Facilities of Concern", which included both the B-5 and C-1 Lockheed facilities.  EPA's figures showed chemical contamination in groundwater monitoring wells placed on or adjacent to the former C-1 and B-5 facilities.  EPA's

-5-

COMPLAINT

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW - A PROFESSIONAL CORPORATION

1   2009 figures showed levels of TCE, PCE, and 6-chrome in the groundwater

2   beneath the C-1 and B-5 facilities at levels that exceed EPA or California state

3   standards for groundwater used (or potentially used) as a source of drinking water.

4        14.   At least one District Court within this District made the following

5   findings of fact in a decision involving Lockheed's operations at its "Burbank

6   site", which is believed to be within a few miles of the Lockheed facilities now

7   part of the Authority's property at the airport: "Defendant Lockheed operated

8   aircraft manufacturing facilities at its Burbank site from 1929 through the early

9   1990's. Lockheed used trichloroethylene ("TCE"), and perchloroethylene ("PCE")

10   through the 1970's and part of the 1980's. Lockheed also used hexavalent

11   chromium, but this use diminished by 1992." *In re: Burbank Environmental*

12   *Litigation*, 42 F. Supp. 2d 976, 978 (C.D. Ca. 1998) (Pfaelzer, J.). On information

13   and belief, the Lockheed aircraft manufacturing activities at the Property, including

14   the use of chemical solvents TCE, PCE, and chromium plating solutions, were

15   substantially the same as its activities and operations at Lockheed's "Burbank"

16   site.

17        15.   The Authority has never operated the Property in a manner that would

18   contaminate the land or groundwater with such chemicals. The Authority has

19   never used the Property located within the North Hollywood OU to manufacture

20   aircraft, to construct aircraft, to design aircraft, or to manufacture or construct any

21   other machined part that would require the use of solvents such as TCE or PCE or

22   would involve the use of a chrome-plating processes.

23        16.   The Authority is informed and believes and thereon alleges that EPA

24   contends that the Authority is a potentially responsible party solely as a result of its

25   current ownership of facilities formerly owned and operated by Lockheed.

26        17.   Beginning in December 2009, EPA has communicated directly with

27   the Authority and indicated that EPA will utilize its Superfund statutory authority

28   (pursuant to 42 U.S.C. Section 9604(e)) to obtain access, install and monitor for an

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW · A PROFESSIONAL CORPORATION

12285-0024\1215212v2.doc

1    unspecified time period at least three groundwater monitoring wells on the

2    Authority's existing property.  EPA's requested access included the installation

3    and sampling of one well immediately adjacent to the former Lockheed C-1 plant.

4

5    ## V.  THE AUTHORITY ASKS THAT LOCKHEED HONOR ITS

6    ## INDEMNIFICATION AND DEFENSE OBLIGATIONS;

7    ## LOCKHEED DOES NOT RESPOND

8        18.    Shortly after receipt of EPA's December 22, 2009 claim, the

9    Authority sent Lockheed a letter dated January 8, 2010, informing Lockheed that

10   EPA's action triggered Lockheed's indemnification obligation.  The letter was

11   addressed to Mr. Douglas Goins, in-house counsel to Lockheed.  Lockheed's

12   Burbank-based technical representative, Mr. Gene S. Matsushita, advised the

13   Authority that Mr. Goins was the appropriate Lockheed representative to receive

14   the Authority's letter.

15       19.    After almost a month passed with no response from Lockheed, the

16   Authority sent Lockheed a follow-up letter dated February 4, 2010.

17       20.    In its February 4, 2010 letter, the Authority advised that EPA

18   requested permission to install groundwater monitoring wells on the Authority's

19   property that had been owned and operated by Lockheed, specifically the C-1

20   property.

21       21.    In its February 4, 2010 letter, the Authority expressly sought

22   confirmation that Lockheed would honor its indemnification obligations to the

23   Authority.  In its February 4, 2010 letter, the Authority specifically advised

24   Lockheed that it had retained legal counsel and environmental consultants to assist

25   it in investigating and responding to EPA.

26       22.    On February 10, 2010 the Authority sent e-mail to Lockheed

27   requesting a written response to its prior letters of January 8, 2010, and February 4,

28   2010.

COMPLAINT

12285-0024\1215212v2.doc

23. Despite the Authority's multiple attempts to communicate with Lockheed, Lockheed has not responded in any manner to the Authority.

24. In the meantime, the Authority is incurring costs and expenses as a result of EPA's claim. These expenses include costs of retaining environmental consultants to investigate EPA's claim and the status of groundwater underneath the Authority's Property and attorneys to assist in this investigation effort. The Authority is also incurring staff costs and time to respond to EPA's request for access to install groundwater monitoring wells, including a well located immediately adjacent to Lockheed's former C-1 property.

25. The Authority is informed and believes and based thereon alleges that once the EPA issues its "special notice" letter in early 2010, it will incur substantially greater costs in the very near future.

26. The Authority is informed and believes and based thereon alleges that EPA will demand that the Authority negotiate with the other parties and proffer a good faith settlement offer to the EPA to perform or finance cleanup actions on the Property.

27. The Authority maintains that pursuant to the indemnification agreements discussed herein, the responsibility for the remedial actions required by EPA are Lockheed's, not the Authority's. On information and belief, Lockheed contends to the contrary.

28. EPA's December 22, 2009 claim triggered Lockheed's duties to defend and indemnify the Authority for all claims arising from Lockheed's pre-transfer activities on the various properties including but not limited to the B-5 and C-1 plant facilities.

29. Although the Authority sought confirmation from Lockheed on multiple occasions that Lockheed will honor its defense and indemnification obligation, Lockheed has not responded in writing (or any other fashion) to the Authority at all.

-8-

COMPLAINT

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW – A PROFESSIONAL CORPORATION

30.     EPA has advised the Authority that it defines the North Hollywood OU to include only the real property and structures located west of the North-South runway at Bob Hope Airport. Based upon this definition, the principal Lockheed properties involved in the North Hollywood OU are the B-5 and C-1 plants. Nonetheless, EPA has indicated that the exact boundary of the North Hollywood OU is not precisely fixed. Rather, EPA maintains that the North Hollywood OU includes all areas that the contamination has come to be located pursuant to the statutory definition under the Superfund statute of "facility." To the extent that EPA's flexible definition of the North Hollywood OU expands beyond the Airport's North/South Runway and extends east of that runway, then other Lockheed facilities, including the Air Tower Site, the B-6 plant, and the A-1 plant are implicated. The Authority has separate indemnification agreements from Lockheed for each of those parcels and will seek to amend this complaint immediately upon a determination by EPA or other authority that the boundary of the North Hollywood OU is deemed to extend to the eastern side of the North/South runway.

## VI.  FIRST CAUSE OF ACTION
[SPECIFIC PERFORMANCE AND INJUNCTIVE RELIEF
(1978 AIRPORT PURCHASE AGREEMENT AND LOCKHEED DIRECT
INDEMNITY AGREEMENT)]

31.     The Authority incorporates by reference each and every allegation contained in Paragraphs 1 through 30 inclusive, as though fully set forth herein.

32.     In 1978, for good, valuable and just consideration, the Authority and LAT, a wholly-owned subsidiary of Lockheed Corporation, entered into an Airport Purchase Agreement for the purchase of approximately 436 net acres of real property with structures upon, including the former Lockheed plant designated as

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW – A PROFESSIONAL CORPORATION

12285-0024\1215212v2.doc

1    B-5. The property was then being operated by LAT as what was then termed the

2    Hollywood-Burbank Airport.

3        33.    A true and correct copy of the 1978 Airport Purchase Agreement is

4    attached hereto as **Exhibit A**.

5        34.    The 1978 Airport Purchase Agreement imposes an indemnification

6    and defense obligation upon LAT for pre-closing actions of Lockheed and claims

7    arising from such actions.

8        35.    Section 15.2 of the 1978 Airport Purchase Agreement states:

9        "LAT [Lockheed Air Terminal, Inc.] shall defend, indemnify

10        and save harmless Authority, its members, officers, employees

11        and agents, and the cities of Burbank, Glendale and Pasadena,

12        their officials, employees and agents, against any and all losses,

13        damages, claims, liabilities, obligations, actions, proceedings,

14        costs and expenses, including attorneys fees, which said

15        persons or entities may hereafter suffer, incur, be put to, pay or

16        lay out by reason of (1) any claim, proceeding or investigation

17        arising or alleged to arise out of or be related to the use,

18        ownership or operation of the Airport and Airport Properties by

19        LAT, Lockheed or any affiliate of either of them prior to Close

20        of Escrow, or (2) the inaccuracy, or the breach by LAT, of any

21        representation or warranty which LAT has made or agreed to

22        hereunder. Nothing contained herein shall require LAT to

23        defend, indemnify or save harmless any of the persons or

24        entities identified in this Section 15.2(a) if such claim, liability,

25        obligation, action or proceeding arises out of or results from

26        acts or omissions of such persons or entities."

27        36.    Section 15.1 of the 1978 Airport Purchase Agreement further provides

28    that:

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW - A PROFESSIONAL CORPORATION

12285-0024\1215212v2.doc

1      "Authority does not assume and shall not be liable for any

2      obligations or liabilities of claims against LAT or Lockheed

3      whatsoever (except as expressly provided in the Assumption

4      Agreement delivered at Close of Escrow pursuant to Section

5      12.2(a) of this Agreement), or any liabilities or claims arising

6      out of or related to the Airport Properties or operation of the

7      Airport prior to Close of Escrow."

8      37.    The Assumption Agreement referenced in Section 15.1 of the 1978

9 Airport Purchase Agreement dealt only with certain "Airport Leases" entered into

10 by LAT and did not include any assumption of environmental liabilities by the

11 Authority for pre-closure operations of LAT.

12      38.    The 1978 Airport Purchase Agreement contained as a exhibit thereto

13 Exhibit "I", which was a direct indemnity agreement between Lockheed

14 Corporation and the then Hollywood-Burbank Airport Authority ("Lockheed

15 Direct Indemnity"). A true and correct copy of Lockheed's Direct Indemnity,

16 Exhibit "I" to the 1978 Airport Purchase Agreement, is attached hereto as **Exhibit**

17 **B**.

18      39.    Lockheed's Direct Indemnity imposes in Section 4(a) thereof an

19 express and direct duty to defend and indemnification agreement upon Lockheed

20 as follows:

21      "Lockheed shall defend, indemnify and save harmless

22      Authority, its members, officers, employees and agents. . .

23      against any and all losses, damages, claims, liabilities,

24      obligations, actions, proceedings, costs and expenses, including

25      attorney's fees, which said persons or entities may hereafter

26      suffer, incur, be put to, pay or lay out by reason of (1) any

27      claim, proceeding or investigation arising or alleged to arise out

28      of or be related to the use, ownership or operation of the Airport

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW – A PROFESSIONAL CORPORATION

-11-

COMPLAINT

1   and Airport Properties prior to the Close of Escrow by LAT,

2   Lockheed or any affiliate or either of them. . .

3   Nothing contained herein shall require Lockheed to defend,

4   indemnify or save harmless any of the persons or entities

5   identified in this Section 4(a) if such claim, liability, obligation,

6   action or proceeding arises out of or results from acts or

7   omissions of such persons or entities."

8       40.    Both the 1978 Airport Purchase Agreement between the Authority

9   and LAT and Lockheed's Direct Indemnity, contain clauses that require that

10  Lockheed to defend and indemnify the Authority against various costs including

11  but not limited to actual attorney's fees suffered or incurred as a result of a covered

12  claim.

13      41.    The EPA's actions against the Authority with respect to the North

14  Hollywood OU, including its December 22, 2009 letter and its "special notice"

15  letter to be issued in "early 2010," constitute a claim against the Authority.

16  Lockheed is obligated to defend and indemnify the Authority pursuant to the 1978

17  Airport Purchase Agreement and the Lockheed Direct Indemnity.

18      42.    The 1978 Airport Purchase Agreement, which expressly incorporates

19  the exhibits to the Agreement, provides that:

20      "18.4  Survival of Representations, Warranties and Covenants.

21      Except as otherwise provided in this Agreement, all

22      representations, warranties, covenants and agreements of each

23      party set forth in this Agreement or in any schedule, certificate,

24      document or list delivered by such party shall survive Close of

25      Escrow."

26  This clause applies to LAT's duty to defend and indemnify the Authority under the

27  1978 Airport Purchase Agreement and also applies to Lockheed's Direct

28  Indemnity pursuant to Exhibit "I" to the Agreement, which was expressly

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW – A PROFESSIONAL CORPORATION

-12-
COMPLAINT

1   referenced and made part of the 1978 Airport Purchase Agreement pursuant to

2   Section 18.9 thereof.

3        43.   The Authority has provided notice to Lockheed of the claim by EPA.

4        44.   The Authority has requested that Lockheed indemnify the Authority

5   for the claim asserted by EPA in at least two separate letters and one e-mail

6   addressed to Lockheed's in-house counsel for this matter, Douglas Goins, Esq.

7        45.   The Authority has performed all of the terms, covenants, conditions,

8   obligations and provisions required to be performed by it under the 1978 Airport

9   Purchase Agreement with Lockheed except for those which it was prevented or

10  excused from performing.

11       46.   The claim by EPA falls within the defense and indemnity obligations

12  described herein, thereby giving rise to the obligation of Lockheed under the 1978

13  Airport Purchase Agreement and the Lockheed Direct Indemnity to provide a

14  defense to the Authority, and to indemnify the Authority against any loss or

15  liability arising from such claims against the Authority.

16       47.   Both the 1978 Airport Purchase Agreement and the Lockheed Direct

17  Indemnity provide that the Agreement is to be interpreted pursuant to California

18  law.  Lockheed is obligated to defend and indemnify the Authority with respect to

19  the claim by EPA.

20       48.   Under the terms of the 1978 Airport Purchase Agreement and the

21  Lockheed Direct Indemnity, Lockheed is liable to pay on the Authority's behalf,

22  and to reimburse the Authority for, all amounts which the Authority has paid and is

23  required in the future to pay in connection with the North Hollywood OU, and any

24  future claims, including defense costs, and all sums that the Authority has paid

25  and, in the future, must pay for investigation and response to such claims, and in

26  settlement of such claims.

27       49.   No provisions of the agreements herein bar the Authority's

28  entitlement to the defense and indemnity at issue.

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW - A PROFESSIONAL CORPORATION

-13-

50. To date, Lockheed has failed and refused to provide a defense to the Authority with respect to the claims described herein.

51. To date, Lockheed has failed and refused to provide an indemnity to the Authority with respect to the claims described herein.

52. Lockheed has denied its obligations to defend or indemnify the Authority with respect to the EPA claim. The Authority's former environmental consultant, the firm of ENSR, now part of a larger corporation known as AECOM, was advised in February 2010 by Lockheed's technical advisor in Burbank, Mr. Gene Matsushita, that Lockheed would not consent to allow ENSR do any further environmental work for the Authority on the grounds that the Authority was "seeking to evade" its alleged responsibility for cleanup costs in the North Hollywood OU.

53. Lockheed, after demand, has failed to make payment to the Authority in accordance with the terms of the 1978 Airport Purchase Agreement or the Lockheed Direct Indemnity.

54. As a result of Lockheed's failure to provide a full defense of the claims described above, the Authority has been required to retain and pay attorneys to defend it with respect to such claims.

55. By refusing to indemnify the Authority against any potential liability arising out of the EPA claims, the Authority was left to defend itself against the allegations made against it in the claims.

56. Specific performance in the form of affirmative injunctive relief is merited in that without immediate relief the Authority will face an EPA "special notice" letter that will require action to submit a "good faith offer" (as defined by EPA) within 60 days. But, the Authority faces a Hobson's choice: If it submits a "good faith offer" along with Lockheed and other potentially responsible parties then Lockheed will argue that the Authority has "voluntarily" taken action and that Lockheed need not indemnify or defend the Authority from such a purported

12285-0024\1215212v2.doc

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW  A PROFESSIONAL CORPORATION

1  "voluntary action."  On the other hand, if the Authority fails to submit such a

2  "good faith offer" it could be subject to direct proceedings by the EPA and be

3  labeled as a "recalcitrant" party in the North Hollywood OU.  In addition, EPA

4  could then issue a separate order to the Authority pursuant to 42 U.S.C. Section

5  9606 requiring the Authority to implement part of the work required under the

6  2009 Focused Feasibility Study (and remedial action) and subjecting the Authority

7  to daily fines and penalties of as much as $27,500 per day.  This Hobson's choice

8  cannot be rectified by a subsequent monetary reimbursement by Lockheed.

9      57.   Moreover, on information and belief, Lockheed will assert that any

10  fines or penalties imposed by EPA upon the Authority would be the result of the

11  Authority's own actions or negligence, thereby invoking the provision of both the

12  1978 Airport Purchase Agreement and the Lockheed Direct Indemnity that state

13  that Lockheed need not defend or indemnify the Authority if the "claim, liability,

14  obligation, action or proceeding" arises out of or results from "acts or omissions of

15  such [covered] persons or entities."

16      58.   The Authority is a public entity governed by Commissioners who

17  represent various public agencies including the cities of Burbank, Glendale, and

18  Pasadena.  The Authority will suffer irreparable damage and harm if it is branded

19  by EPA as a "recalcitrant party" with respect to a major Superfund site located in

20  and around its current real property.

21      59.   The Authority is entitled to specific performance and injunctive relief

22  compelling Lockheed to provide an immediate defense and further compelling

23  Lockheed to provide an indemnification of the Authority for all claims made by

24  EPA in connection with the Authority's alleged responsible party status in

25  connection with the North Hollywood OU.  Injunctive relief is in the public

26  interest in that it will avoid undue financial stress and hardship upon a public entity

27  that caused no groundwater pollution in the North Hollywood OU and will instead

28

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW - A PROFESSIONAL CORPORATION

-15-

COMPLAINT

1   place that burden upon a financially solvent private party that did pollute the

2   groundwater, Lockheed.

3       60.   Although the exact monetary impact of Lockheed's failure to defend

4   and indemnify the Authority pursuant to the 1978 Airport Purchase Agreement and

5   the Lockheed Direct Indemnity cannot be calculated, it is well beyond the

6   jurisdictional minimum required for diversity jurisdiction.  EPA has estimated that

7   the next phase of an "interim" remedy to cost at least $108 million.  That sum is at

8   best an estimate at a feasibility study phase, and under EPA guidance documents,

9   cost estimates at the feasibility study phase are deemed acceptable by EPA even if

10  actual costs exceed that estimate by as much as 100%.  Even if the costs were

11  limited to the current preliminary EPA cost estimate, a party assigned even a 1%

12  share for the North Hollywood OU would pay more than $1 million for its alleged

13  portion of remedial costs.

14

15          **VII.  SECOND CAUSE OF ACTION**

16    [DECLARATORY JUDGMENT  PURSUANT TO 28 U.S.C. SECTION 2201

17    (1978 AIRPORT PURCHASE AGREEMENT AND LOCKHEED DIRECT

18                    INDEMNITY AGREEMENT)]

19      61.   The Authority incorporates by reference each and every allegation

20  contained in Paragraphs 1 through 30 and Paragraphs 32-55 inclusive, as though

21  fully set forth herein.

22      62.   Based upon Lockheed's failure to defend and indemnify the Authority

23  as detailed in Paragraphs 32-55 above, the Authority is entitled to a judicial

24  declaration that it is entitled to a defense and indemnification for all property

25  covered by the 1978 Airport Purchase Agreement and the Lockheed Direct

26  Indemnity that falls within the North Hollywood OU.  There is a genuine dispute

27  between the Authority and Lockheed that requires a determination of the

28

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW · A PROFESSIONAL CORPORATION

COMPLAINT

12285-0024\1215212v2.doc

1  Authority's legal rights under the 1978 Airport Purchase Agreement and the

2  Lockheed Direct Indemnity.  The Authority seeks a judicial declaration that:

3        (a)   Lockheed is denying a defense to the Authority without proper

4  cause and without regard to provisions of the agreement, relevant case law and the

5  undisputed facts of the claims;

6        (b)   Lockheed is repudiating the obligations under the 1978 Airport

7  Purchase Agreement and the Lockheed Direct Indemnity thereto;

8        (c)   Lockheed has failed to acknowledge the request for indemnity

9  and act reasonably promptly upon communications with respect to the EPA claim

10  arising under the two indemnity agreements;

11        (d)   Lockheed has failed to pay and to reimburse the Authority for

12  payments for defense and investigation costs, knowing the claim for defense to be

13  valid;

14        (e)   Lockheed has failed to attempt in good faith to comply with the

15  obligations under the agreements with the Authority;

16        (f)   Lockheed has failed to agree to fully indemnify the Authority

17  with respect to the EPA claim;

18        (g)   Lockheed has thereby compelled the Authority to institute

19  litigation in order to force compliance with Lockheed's contractual obligations,

20  and incur additional attorneys' fees in the course of instituting said lawsuit.

21        63.   This court is authorized to issue such a declaratory judgment pursuant

22  to 28 U.S.C. Section 2201.

23  ///

24  ///

25  ///

26  ///

27  ///

28

COMPLAINT

12285-0024\1215212v2.doc

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW – A PROFESSIONAL CORPORATION

# VIII.  THIRD CAUSE OF ACTION

[BREACH OF CONTRACT—1978 AIRPORT PURCHASE AGREEMENT AND LOCKHEED DIRECT INDEMNITY AGREEMENT]

64.   The Authority incorporates by reference each and every allegation contained in Paragraphs 1 through 30 and Paragraphs 32-55 inclusive, as though fully set forth herein.

65.   Lockheed entered into binding contracts both directly and through its then wholly-owned subsidiary, LAT, with the Authority in 1978.  Those agreements are the 1978 Airport Purchase Agreement and the Lockheed Direct Indemnity.

66.   Lockheed has breached both contracts with the Authority by refusing to acknowledge, respond to, and undertake a defense and indemnification of the Authority in response to the EPA claim of liability as set forth in its December 22, 2009 letter.

67.   The Authority has fulfilled all of its obligations under the 1978 Airport Purchase Agreement and the Lockheed Direct Indemnity.

68.   As a direct, proximate and foreseeable result of the breaches of Lockheed, the Authority has been damaged in an amount not yet fully ascertained, but which exceeds the jurisdictional amount for this court, and which includes the cost of defending against the claims asserted against the Authority by EPA, payments made to retain environmental consultants, and the attorneys' fees and costs incurred in connection with establishing the obligations owing under the 1978 Airport Purchase Agreement and the Lockheed Direct Indemnity.

69.   As a result of Lockheed's breaches of the 1978 Airport Purchase Agreement and the Lockheed Direct Indemnity, the Authority has suffered damages recoverable under the terms and conditions of the contract including costs, expenses, environmental expert and attorneys' fees.  The precise amount of

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW   A PROFESSIONAL CORPORATION

COMPLAINT

12285-0024\1215212v2.doc

1   damages (exclusive of interest and costs) suffered by the Authority shall be subject

2   to proof at trial, but is greater than $75,000.00.

3

4               **IX.  FOURTH CAUSE OF ACTION**

5        [SPECIFIC PERFORMANCE AND INJUNCTIVE RELIEF

6     (1980 C-1 AREA LEASE AGREEMENT AND 1986 AMENDMENT]

7        70.    The Authority incorporates by reference each and every allegation

8   contained in Paragraphs 1 through 30 inclusive, as though fully set forth herein.

9        71.    Lockheed retained ownership and operations in certain other real

10  property located in and adjacent to that portion of the airport it sold to the

11  Authority by virtue of the 1978 Airport Purchase Agreement.  One such parcel,

12  commonly known as Lockheed plant C-1, was located in the northwest quadrant of

13  the Airport and continued to operate as an aircraft manufacturing facility after

14  1978.

15       72.    In 1980, Lockheed, through its subsidiary, Lockheed Properties, Inc.,

16  entered into a multi-year lease with the Authority for property immediately south

17  of Lockheed's C-1 plant and specifically south of Lockheed Buildings Nos. 35 and

18  40 for space consisting of approximately 88,060 square feet of real property owned

19  by the Authority (the "1980 Lease").  The 1980 Lease was to commence in 1981

20  and continue thereafter.  The lease specifically indicated that the leased premises

21  were to be used for "aircraft assembly activities."  A true and correct copy of the

22  1980 Lease is attached hereto as **Exhibit C.**

23       73.    On information and belief, Lockheed continued to use industrial

24  solvents and other chemicals that constitute "hazardous substances" as defined

25  under CERCLA, as part of its aircraft assembly operations on the property it leased

26  from the Authority pursuant to the 1980 Lease.

27       74.    The 1980 Lease provided an express indemnification by Lockheed

28  Properties, Inc. to the Authority which provided in pertinent part that:

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW – A PROFESSIONAL CORPORATION

-19-
COMPLAINT

1
2
3
4
5
6
7
8
9

"Lessee [Lockheed Properties, Inc.] shall defend, indemnify and save harmless the Lessor [the Authority] from and against any and all claims, suits, actions, damages arising during the term of this Lease for any personal injury, loss of life, or damage to property sustained in or about the leased premises, by reason or as a result of the Lessee's occupancy thereof, and not resulting from Lessor's negligence, and from and against any orders, judgments, or degrees which may be entered thereon."

75.   In 1986, Lockheed-California Company, a division of Lockheed Corporation, executed a First Amendment to Lease with the Authority.  Under the 1986 Lease Amendment, Lockheed-California Company assumed all responsibilities for the 1980 Lease and specifically succeeded to and assumed the rights and obligations of Lockheed Properties, Inc. under the 1980 Lease.  The First Amendment to the lease also reduced the size of the leasehold interest to approximately 44,304 square feet.  A true and correct copy of the 1986 Lease Amendment is attached hereto as **Exhibit D.**

76.   On information and belief, Lockheed-California Company, a division of Lockheed, continued to lease the approximately 44,304 square feet of property from the Authority until 1991.

77.   The 1980 Lease, which was effectively continued by virtue of the 1986 Lease Amendment, provided in part that:

"In the event Lessor [Authority] elects to commence legal action, Lessee [Lockheed] shall pay its costs and expenses, including its attorneys fees, as determined by a court of competent jurisdiction."

78.   In 1998, the Authority acquired through the exercise of its eminent domain power legal title to the entirety of the Lockheed C-1 plant area.

-20-
COMPLAINT

79.    EPA's July 2009 Focused Feasibility Study specifically identified the Lockheed C-1 plant as a "facility of interest" in connection with potential contamination that necessitated EPA's recommended additional interim remedial action at an estimated cost of $108 million.  On information and belief, this includes that portion of Airport land that was leased initially to Lockheed Properties, Inc. and then to a division of Lockheed itself starting in 1980 and continuing through at least 1991.

80.    Under the terms of the 1980 Lease and the 1986 Lease Amendment Lockheed is liable to pay on the Authority's behalf, and to reimburse the Authority for, all amounts which the Authority has paid and is required in the future to pay in connection with the North Hollywood OU, and any future claims, including defense costs, and all sums that the Authority has paid and, in the future, must pay for investigation and response to such claims, and in settlement of such claims.

81.    No provision of the 1980 Lease or the 1986 Lease Amendment bar the Authority's entitlement to the defense and indemnity at issue.

82.    To date, Lockheed has failed and refused to provide a defense to the Authority with respect to the claims described herein.

83.    To date, Lockheed has failed and refused to provide an indemnity to the Authority with respect to the claims described herein.

84.    Lockheed has denied its obligations to defend or indemnify the Authority with respect to the EPA claim.

85.    As a result of Defendants' failure to provide a full defense of the claims described above, the Authority has been required to retain and pay attorneys to defend it with respect to such claims.

86.    By refusing to indemnify the Authority against any potential liability arising out of the EPA claim, the Authority is left to defend itself against the allegations made against it in the EPA claim.

-21-

COMPLAINT

87. Specific performance by Lockheed and injunctive relief is merited in that without immediate relief the Authority will face an EPA "special notice" letter that will require action to submit a good faith offer (as defined by the Agency) within 60 days. But, the Authority faces a Hobson's choice: If it submits a good faith offer along with Lockheed and other potentially responsible parties, then Lockheed will argue that the Authority has "voluntarily" taken action and that Lockheed need not indemnify nor defend the Authority from such a purported voluntary action. On the other hand, if the Authority fails to submit such a good faith offer it could be subject to direct proceedings by the EPA and be labeled as a "recalcitrant" party in the North Hollywood OU. In addition, EPA could then issue a separate order to the Authority pursuant to 42 U.S.C. Section 9606 ordering the Authority to implement part of the work required under the 2009 Focused Feasibility Study (and remedial action) and subjecting the Authority to daily fines and penalties of as much as $27,500 per day. This Hobson's choice cannot be rectified by a subsequent monetary reimbursement by Lockheed.

88. Moreover, on information and belief, Lockheed will assert that any fines or penalties imposed by EPA upon the Authority would be the result of the Authority's own actions or negligence, thereby invoking the provision of the 1980 Lease that states that Lockheed need not defend or indemnify the Authority if the "claim" arises out of or results from "Lessor's negligence."

89. The Authority is a public entity governed by Commissioners who represent various public agencies including the cities of Burbank, Glendale, and Pasadena. The Authority will suffer irreparable damage and harm if it is branded by EPA as a "recalcitrant party" with respect to a major Superfund site located in and around its current property.

90. The Authority is entitled to specific performance and injunctive relief compelling Lockheed to provide an immediate defense and further compelling Lockheed to provide an indemnification of the Authority for all claims made by

-22-
COMPLAINT

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW · A PROFESSIONAL CORPORATION

1    EPA in connection with the Authority's alleged responsible party status in

2    connection with the North Hollywood OU.  Injunctive relief is in the public

3    interest in that it will avoid undue financial stress and hardship upon a public entity

4    that caused no groundwater pollution in the North Hollywood OU and will instead

5    place that burden upon a financially solvent private party that did pollute the

6    groundwater, Lockheed.

7

8                          **X.  FIFTH CAUSE OF ACTION**

9        [DECLARATORY RELIEF PURSUANT TO 28 U.S.C. SECTION 2201

10          (1980 C-1 AREA LEASE AGREEMENT AND 1986 AMENDMENT)]

11          91.    The Authority incorporates by reference each and every allegation

12   contained in Paragraphs 1 through 30 and Paragraphs 71-86 inclusive, as though

13   fully set forth herein.

14          92.    Based upon Lockheed's failure to defend and indemnify the

15   Authority, the Authority is entitled to a judicial declaration that it is entitled to a

16   defense and indemnification for all property covered by the 1980 Lease Agreement

17   and the 1986 Lease Amendment thereto that falls within the North Hollywood OU.

18   There is a genuine dispute between the Authority and Lockheed that requires a

19   determination of the Authority's legal rights by the 1980 Lease and 1986 Lease

20   Amendment.  The Authority seeks a declaration that:

21          (a)    Lockheed is denying a defense to the Authority without proper

22   cause and without regard to provisions of the agreement, relevant case law and the

23   undisputed facts of the claims;

24          (b)    Lockheed is repudiating the obligations under the 1980 Lease

25   as modified in the 1986 Lease Amendment;

26          (c)    Lockheed has failed to acknowledge the request for indemnity

27   and act reasonably promptly upon communications with respect to the claims

28   arising under the agreements;

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW   A PROFESSIONAL CORPORATION

12285-0024\1215212v2.doc

1    (d)    Lockheed has failed to pay and to reimburse the Authority for

2    payments for defense and investigation costs, knowing the claim to be valid;

3    (e)    Lockheed has failed to attempt in good faith to comply with the

4    obligations under the agreements with the Authority;

5    (f)    Lockheed has failed to agree to fully indemnify the Authority

6    with respect to the claims; and

7    (g)    Lockheed has thereby compelled the Authority to institute

8    litigation in order to force compliance with Lockheed's contractual obligations,

9    and incur additional attorneys' fees in the course of instituting said lawsuit.

10    93.    This court is authorized to issue such a declaratory judgment pursuant

11    to 28 U.S.C. Section 2201.

## XI.  SIXTH CAUSE OF ACTION

### [BREACH OF CONTRACT (1980 C-1 AREA LEASE AGREEMENT AND 1986 AMENDMENT)]

16    94.    The Authority incorporates by reference each and every allegation

17    contained in Paragraphs 1 through 30 and Paragraphs 71 through 86 inclusive, as

18    though fully set forth herein.

19    95.    The 1980 Lease, as modified by the 1986 Lease Amendment,

20    constitutes a binding contract between the Authority and Lockheed.

21    96.    The EPA claim, as stated initially in its December 22, 2009 letter and

22    to be restated in EPA's special notice letter anticipated in "early 2010," alleges

23    liability for actions at the Lockheed plant C-1 facility that have caused the release

24    or discharge of hazardous substances onto property now owned by the Authority.

25    On information and belief, EPA is asserting that the Authority is liable now based

26    upon actions taken by Lockheed while it was a lessee of at least a portion of the

27    C-1 plant described in the 1980 Lease and modified in description in the 1986 First

28    Amendment.

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW    A PROFESSIONAL CORPORATION

-24-

12285-0024\1215212v2.doc

97.  The 1980 Lease and 1986 Lease Amendment requires Lockheed to defend and indemnify the Authority for the claim made by EPA related to the North Hollywood OU.

98.  The Authority has provided notice to Lockheed of the claim by EPA, and specifically included a copy of the EPA letter in the Authority's January 8, 2010 letter to Douglas Goins, Esq. of Lockheed.

99.  The Authority has repeatedly requested that Lockheed indemnify the Authority for the EPA claim.

100.  The Authority has performed all of the terms, covenants, conditions, obligations and provisions required to be performed by it under the 1980 Lease as modified by the 1986 Lease Amendment with Lockheed except for those which it was prevented or excused from performing.

101.  The EPA claim falls within the scope of Lockheed's duty to defend the Authority under the 1980 Lease and 1986 Lease Amendment.

102.  Lockheed is obligated to indemnify the Authority with respect to the EPA claim.

103.  Lockheed is liable to pay on the Authority's behalf and to reimburse the Authority for all amounts which the Authority has paid and is required in the future to pay in connection with the North Hollywood OU, and any future claims, including defense costs when applicable, and all sums that the Authority has paid and, in the future, must pay for investigation and response to such claims, and in settlement of such claims.

104.  No provisions of the agreements herein bar the Authority's entitlement to the defense and indemnity at issue.

105.  To date, Lockheed has failed and refused to defend or to provide an indemnity to the Authority with respect to the EPA claim described herein.

106.  Lockheed has further repudiated and denied its obligations to defend or indemnify the Authority with respect to the EPA claim.

-25-

COMPLAINT

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW   A PROFESSIONAL CORPORATION

107.   Lockheed has failed after demand to make payment to the Authority in accordance with the terms of the 1980 Lease Agreement and the 1986 Lease Amendment thereto.

108.   Lockheed's refusal to defend or indemnify the Authority against any potential liability arising out of the EPA claim, has required the Authority to defend itself against the allegations made against it in EPA's claim.

109.   Lockheed has breached the 1980 Lease Agreement and 1986 Lease Amendment thereto with the Authority by refusing to defend and indemnify the Authority with respect to the claims described above.

110.   Lockheed has also breached the 1980 Lease Agreement and the 1986 First Amendment thereto with the Authority by failing or refusing to fully reimburse the Authority for its defense and investigation costs to date.

111.   The Authority is informed and believes and thereon alleges that Lockheed further breached the 1980 Lease Agreement and Lease Amendment thereto with the Authority by:

   (a)   Repudiating its obligations in the agreements;

   (b)   Failing to acknowledge the request for indemnity and act reasonably promptly upon communications with respect to the claims arising under the agreements;

   (c)   Failing to pay and to reimburse the Authority for payments for investigation costs, knowing the claim to be valid;

   (d)   Failing to attempt in good faith to comply with the obligations under the agreements with the Authority;

   (e)   Failing to agree to fully indemnify the Authority with respect to the claims;

   (f)   Compelling the Authority to institute litigation in order to force compliance with Lockheed's obligations.

COMPLAINT

12285-0024\1215212v2.doc

112.   As a direct, proximate and foreseeable result of the breaches and acts of Lockheed, the Authority has been damaged in an amount not yet fully ascertained, but which exceeds $75,000.00, and which includes payments made to retain environmental consultants, and the attorneys' fees and costs incurred in connection with defending itself against the EPA claim.

113.   As a result of Lockheed's breaches of the 1980 Lease and 1986 Lease Amendment with the Authority, the Authority has suffered damages recoverable under the terms and conditions of the contracts.  The precise amount of damages (exclusive of interest and costs) suffered by the Authority shall be subject to proof at trial, but is clearly more than the jurisdictional amount of $75,000.00 required for this diversity action.

## **PRAYER FOR RELIEF**

WHEREFORE, the Authority prays for a judgment against Lockheed, as follows:

## **ON THE FIRST CAUSE OF ACTION**

1.   For specific performance and a mandatory injunction compelling Lockheed to honor its contractual obligations to defend and indemnify the Authority against the EPA claim as to the B-5 plant and any related property acquired by virtue of the 1978 Airport Purchase Agreement and the Lockheed Direct Indemnity within the North Hollywood OU.

## **ON THE SECOND CAUSE OF ACTION**

2.   For a judicial declaration of the Authority's legal rights under the 1978 Airport Purchase Agreement and the Lockheed Direct Indemnification that:

(a)   Lockheed has breached its defense obligations to the Authority;

COMPLAINT

12285-0024\1215212v2.doc

1            (b)    Lockheed is required to defend the Authority in connection

2    with the EPA claim;

3            (c)    Lockheed is obligated to fully reimburse the Authority's

4    defense fees and costs incurred in connection with the EPA claim;

5            (d)    Lockheed has breached its indemnity obligations to the

6    Authority with respect to the EPA claim;

7            (e)    Lockheed is required to indemnify the Authority for the EPA

8    claim pursuant to the terms of the 1978 Airport Purchase Agreement and the

9    Lockheed Direct Indemnity.

10

11    **ON THE THIRD CAUSE OF ACTION**

12        3.    For damages, including attorneys fees and expert costs, in an amount

13    according to proof at trial.

14

15    **ON THE FOURTH CAUSE OF ACTION**

16        4.    For specific performance and a mandatory injunction compelling

17    Lockheed to honor its contractual obligations to defend and indemnify the

18    Authority against the EPA claim as to the leased property adjacent to the Lockheed

19    C-1 plant by virtue of the 1980 Lease Agreement and the 1986 Lease Amendment.

20

21    **ON THE FIFTH CAUSE OF ACTION**

22        5.    For a judicial declaration of the Authority's legal rights under the

23    1980 Lease Agreement and the 1986 Lease Amendment described herein, and, in

24    particular a declaration that:

25            (a)    Lockheed has breached its duty to defend the Authority for the

26    EPA claim;

27

28

COMPLAINT

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW - A PROFESSIONAL CORPORATION

(b)     Lockheed is required to indemnify the Authority for the EPA claim pursuant to the terms of the 1980 Lease Agreement and the 1986 Lease Amendment.

## ON THE SIXTH CAUSE OF ACTION

6.     For damages, including attorneys fees and expert costs, in an amount according to proof at trial.

## ON ALL CAUSES OF ACTION

7.     For attorneys' fees as provided for in the contractual agreements;

8.     For prejudgment interest;

9.     For its costs of suit incurred herein, including expert environmental costs; and

10.     For such other and further relief as the court may deem just and proper.

DATED:  April 1, 2010

NORMAN A. DUPONT
DAVID G. ALDERSON
WHITNEY G. MCDONALD
RICHARDS, WATSON & GERSHON

By: _____
Norman A. Dupont
Attorneys for Plaintiff
BURBANK-GLENDALE-PASADENA
AIRPORT AUTHORITY

-29-

COMPLAINT

## DEMAND FOR JURY TRIAL

The Burbank-Glendale-Pasadena Airport Authority hereby demands a trial by jury on all issues which a jury may determine pursuant to Rule 38(b).


DATED:  April 1, 2010

NORMAN A. DUPONT
DAVID G. ALDERSON
WHITNEY G. MCDONALD
RICHARDS, WATSON & GERSHON

By: _____
    Norman A. Dupont
    Attorneys for Plaintiff
    BURBANK-GLENDALE-PASADENA
    AIRPORT AUTHORITY

-30-
COMPLAINT

**EXHIBIT A**

AIRPORT PURCHASE AGREEMENT

As Of

March 30, 1978

Between

HOLLYWOOD-BURBANK AIRPORT AUTHORITY

and

LOCKHEED AIR TERMINAL, INC.

# AIRPORT PURCHASE AGREEMENT

## INDEX

| Section | | Caption | Page |
|---|---|---|---|
| 1 | | Transfer of Assets | 3 |
| | 1.1 | Sale and Acquisition of Airport Properties | 3 |
| | 1.2 | Definition of Airport Properties | 5 |
| 2 | | Grant Agreements | 6 |
| | 2.1 | Decision of the Secretary of Transportation | 6 |
| | 2.2 | Order of Payments Under the Grant Agreement | 6 |
| | 2.3 | Maintenance of Grant Agreements | 7 |
| 3 | | Purchase Price | 7 |
| | 3.1 | Amount of Purchase Price | 7 |
| | 3.2 | Payment of Proceeds From Revenue Bonds at Close of Escrow | 7 |
| | 3.3 | Payment of ADAP Funds After Close of Escrow | 8 |
| | 3.4 | Payment of Balance | 8 |
| | 3.5 | Covenants by Authority | 12 |
| 4 | | Escrow | 16 |
| | 4.1 | Escrow Holder | 16 |
| | 4.2 | Escrow Instructions | 16 |
| | 4.3 | Close of Escrow | 16 |
| 5 | | Title Insurance and Survey | 17 |
| | 5.1 | Policy of Title Insurance | 17 |
| | 5.2 | Date Downs of Title Report | 18 |
| | 5.3 | Survey | 19 |

| 6    | Representations and Warranties of LAT | 19 |
|------|---------------------------------------|-----|
| 6.1  | Organization, Standing, and Qualification | 20 |
| 6.2  | Agreement Will Not Cause Violation or Breach | 20 |
| 6.3  | Authorization | 20 |
| 6.4  | Title to Airport Properties | 21 |
| 6.5  | Litigation and Compliance With Laws | 21 |
| 6.6  | Absence of Default | 22 |
| 6.7  | Restrictions | 22 |
| 6.8  | Easements | 23 |
| 6.9  | Condition of Buildings and Equipment | 23 |
| 6.10 | Enforceability of Airport Leases; No Default | 24 |
| 6.11 | Contracts and Commitments | 24 |
| 6.12 | Governmental Consents and Approvals | 24 |
| 6.13 | Ownership of LAT | 25 |
| 7    | Representations and Warranties of Authority | 25 |
| 7.1  | Organization and Authority of Authority | 25 |
| 7.2  | Validity of Contemplated Transaction | 25 |
| 7.3  | Litigation | 26 |
| 7.4  | Liabilities of Authority | 27 |
| 7.5  | Continued Existence of Authority | 27 |
| 8    | Conduct of Business Pending Close of Escrow | 27 |
| 8.1  | Business in the Ordinary Course | 28 |
| 8.2  | Maintenance of Property | 28 |
| 8.3  | Insurance | 28 |
| 8.4  | Litigation During Interim Period | 28 |

| | | |
|---|---|---|
| 8.5 | Access | 29 |
| 8.6 | Business Relations | 30 |
| 8.7 | Consent of Lenders and GSA | 30 |
| 9 | Obligations of Authority Pending Close of Escrow | 31 |
| 9.1 | Authority's Entitlements to Use | 31 |
| 9.2 | Sale of Revenue Bonds | 31 |
| 9.3 | Litigation During Interim Period | 31 |
| 10 | Conditions Precedent to Authority's Obligations | 32 |
| 10.1 | Representations and Warranties | 32 |
| 10.2 | Compliance with Agreements | 33 |
| 10.3 | Opinion of Counsel | 33 |
| 10.4 | Title Insurance and Survey | 36 |
| 10.5 | Litigation Affecting Closing | 36 |
| 10.6 | Consents, Approvals and Operating Rights | 36 |
| 10.7 | Execution of Grant Agreements | 37 |
| 10.8 | Sale of Revenue Bonds | 37 |
| 10.9 | Agreement With Lockheed | 37 |
| 10.10 | Banks' Consent | 37 |
| 10.11 | Airline Use Agreements | 38 |
| 10.12 | Closing Documents | 38 |
| 11 | Conditions Precedent to Obligations of LAT | 38 |
| 11.1 | Representations and Warranties | 38 |
| 11.2 | Compliance With Agreements | 39 |
| 11.3 | Opinion of Counsel | 39 |

| 11.4 | Litigation Affecting Acquisition | 44 |
|------|-------------------------------------------------------------------|-----|
| 11.5 | Grant Agreements | 44 |
| 11.6 | Banks' Consent | 44 |
| 11.7 | Release of GSA Lien | 44 |
| 11.8 | Revenue Bond Documents | 45 |
| 11.9 | Airline Use Agreements | 45 |
| 11.10 | Survey and Legal Description | 45 |
| 11.11 | Closing Documents | 46 |
| 12 | Documents to be Delivered to Escrow Holder Prior to Close of Escrow | 46 |
| 12.1 | Documents to be Delivered by LAT | 46 |
| 12.2 | Documents to be Delivered by Authority | 48 |
| 12.3 | Related Agreements to be Executed and Delivered at Close of Escrow | 50 |
| 13 | Possession, Prorations; Rentals | 51 |
| 13.1 | Possession | 51 |
| 13.2 | Prorations | 51 |
| 13.3 | Rentals | 52 |
| 14 | Damage to Airport Properties | 52 |
| 14.1 | Risk of Loss on LAT | 52 |
| 14.2 | Loss Prior to Close of Escrow | 53 |
| 15 | Nonassumption of Liabilities and Indemnification | 54 |
| 15.1 | No Assumption of Liabilities | 54 |
| 15.2 | Indemnification | 54 |

| 16 | Further Assurances | 57 |
|----|--------------------|-----|
| 17 | Relocation Assistance Benefits | 58 |
| 18 | Miscellaneous Provisions | 58 |
| 18.1 | Brokers | 58 |
| 18.2 | Notices | 59 |
| 18.3 | Successors and Assigns | 60 |
| 18.4 | Survival of Representations, Warranties and Covenants | 60 |
| 18.5 | Expenses | 61 |
| 18.6 | Entire Agreement | 61 |
| 18.7 | California Law to Govern | 62 |
| 18.8 | Section Headings | 62 |
| 18.9 | Exhibits | 62 |
| 18.10 | Counterparts | 62 |
| 18.11 | Amendment | 63 |
| 18.12 | Time is of the Essence | 63 |

## EXHIBITS

A.      Preliminary Title Report

A-1     Exceptions to Title Disapproved by Authority

B.      Buildings and Improvements

C.      Easements

D.      Personal Property and Equipment

E.      Airport Leases

F.      Escrow Instructions

G.      Exceptions to Representations and Warranties
        of LAT

H.      Exceptions to Representations and Warranties
        of Authority and Agreement for Assurances to
        Revenue Bond Purchasers

I.      Agreement Between Lockheed Corporation and
        the Authority

J.      Leases Between Authority and LAT and Lockheed
        Corporation

K.      Airport Facilities Use Agreement

L.      Fueling Services Agreements

M.      Airport Services Agreement

N.      Agreement for Crash-Fire-Rescue Services

# AIRPORT PURCHASE AGREEMENT

THIS AIRPORT PURCHASE AGREEMENT ("Agreement") is dated as of the 30th day of March, 1978, by and between the HOLLYWOOD-BURBANK AIRPORT AUTHORITY, a public entity formed under a joint exercise of powers agreement among the Cities of Burbank, Glendale and Pasadena, California, pursuant to the California joint exercise of powers act ("Authority"), and LOCKHEED AIR TERMINAL, INC., a Delaware corporation ("LAT"), a wholly-owned subsidiary of Lockheed Corporation, a California corporation ("Lockheed").

## R E C I T A L S:

A.  LAT owns certain land located primarily within the boundaries of the City of Burbank and partially within the boundaries of the City of Los Angeles in the County of Los Angeles, State of California.  The land, containing approximately 435.5 acres net, together with the buildings, structures and other improvements thereon, has been developed and is being operated by LAT as the Hollywood-Burbank Airport (the "Airport"), an airport within the national and state transportation systems.

B.   The Cities of Burbank, Glendale and Pasadena have formed Authority for the purpose of acquisition, operation, improvement, repair, maintenance and administration of the Airport.  The purchase price for the Airport has been agreed upon as $51,000,000.  Authority intends to finance that acquisition in part by federal grant funds.  In connection therewith, Authority filed an application with the Federal Aviation Administration (the "FAA") for federal funding assistance under the provisions of the Airport and Airway Development Act of 1970, as amended, Pub. L. 91-258, 84 Stat. 219, 49 U.S.C. §§1701 et seq.  The federal funds expected to be granted to Authority pursuant to said Airport and Airway Development Act of 1970 under the Airport Development and Aid Program in the aggregate amount of $35,281,227 for acquisition of the Airport are hereinafter referred to as the "ADAP Funds".  In order to secure the ADAP Funds, Authority must enter into one or more grant agreements with the FAA (the "Grant Agreements").  Authority intends to finance that portion of the purchase price of the Airport not covered by ADAP Funds with a portion of the proceeds from the sale of revenue bonds to be issued simultaneously with the purchase of the Airport (the "Revenue Bonds").

2

C.   As described in more detail in Section 2.1 of this Agreement, the Secretary of Transportation has approved Federal funding assistance to Authority in the amount of $35,488,764 as stated in the Secretary's decision, of which $35,281,227 is allocated for acquisition of the Airport. The parties would not enter into this Agreement if Authority did not have the assurance of such funding assistance. LAT's participation in this Agreement is premised on the ability of Authority to pay the full purchase price, and that ability arises principally from the funding commitment made by the Secretary of Transportation.

NOW, THEREFORE, the parties hereto, in reliance upon the commitment by the Secretary of Transportation, the foregoing recitals and the representations and warranties set forth in this Agreement, and in consideration of the mutual agreements and covenants set forth in this Agreement, do hereby agree as follows:

1.   TRANSFER OF ASSETS

1.1   Sale and Acquisition of Airport Properties. LAT agrees to sell, convey, assign and transfer to Authority and Authority agrees to purchase from LAT, on the terms and

3

conditions and for the price set forth herein, the following property:

      (a)  <u>Real Property</u>.  A fee simple estate in and to that certain real property located primarily in the City of Burbank and partially in the City of Los Angeles, County of Los Angeles, State of California, commonly known as the Hollywood-Burbank Airport and more particularly described in that certain preliminary title report (the "Title Report"), issued by Title Insurance and Trust Company, Report No. 7589415, revised as of March 13, 1978, a copy of which is attached hereto as Exhibit A, together with all buildings, structures, and other improvements thereon including, but not limited to, those described in Exhibit B hereto, and all appurtenances thereto (such real property, improvements and appurtenances are hereinafter collectively referred to as the "Real Property");

      (b)  <u>Easements and Rights</u>.  All of LAT's right, title and interest in and to all easements and other rights (collectively, the "Easements") over, in and to property owned by others and which benefit the Real Property or otherwise pertain to the operation of

the Airport and the Airport Properties, including those
Easements described in Exhibits A and C hereto;

     (c)  Equipment.  That certain personal pro-
perty and equipment (the "Equipment") described in
Exhibit D hereto;

     (d)  Airport Leases.  LAT's interest in and
to those certain leases, licenses and other agreements
(the "Airport Leases") described in Exhibit E hereto;
and

     (e)  Operating Permit.  LAT's interest in and
to the California Aeronautical Permit relating to the
Airport (the "Operating Permit").

    1.2  Definition of Airport Properties.  The Real
Property, the Easements, the Equipment, the Airport Leases
and the Operating Permit are herein collectively referred to
as the "Airport Properties."  Transfer of title to all or a
portion of the Airport Properties shall be made by LAT to
the City of Burbank for immediate conveyance to Authority if
requested by Authority no later than fifteen (15) business
days prior to Close of Escrow.

2.   GRANT AGREEMENTS

2.1   Decision of the Secretary of Transportation.
The Secretary of Transportation, on October 4, 1977, decided
that Hollywood-Burbank Airport should be operated as a
public transportation facility and approved Federal funding
assistance to the Authority in the amount of $35,281,227 to
acquire the Airport.   On October 4, 1977, Authority accepted
Grant Agreement DOT-FA78-WE 4484, which contains a grant
from the United States to Authority of $1 million.   The
parties hereto understand that the United States, acting
through the Department of Transportation and the FAA, plans
to make additional grants during its current fiscal year and
the following two fiscal years ending on September 30, 1980,
in yearly increments of approximately $11.5 million.

2.2   Order of Payments Under the Grant Agreement.
Payment by the FAA to Authority of the ADAP Funds for the
Federal 1977-1978 fiscal year are to be made upon conveyance
of title to the Airport Properties to Authority at the Close
of Escrow.   Payments by the FAA to Authority for Federal
fiscal years 1978-1979 and 1979-1980 are expected to be made
on October 1, 1978 and October 1, 1979, respectively.

2.3   Maintenance of Grant Agreements.   After the Close of Escrow, Authority shall operate the Airport Properties or cause the Airport Properties to be operated as an airport and shall observe and perform all of its obligations under the Grant Agreements so as to prevent any default thereunder by Authority.

3.   PURCHASE PRICE

3.1   Amount of Purchase Price.   The aggregate purchase price for the Airport Properties shall be FIFTY ONE MILLION DOLLARS ($51,000,000) (the "Purchase Price") to be paid in the manner set forth in Sections 3.2 through 3.4 below.   In no event shall any of the cities of Burbank, Glendale and Pasadena, California, have any liability for payment of any portion of the Purchase Price.   All payments shall be in cash in lawful currency of the United States of America.

3.2   Payment of Proceeds From Revenue Bonds at Close of Escrow.   The sum of $15,718,773 from the net proceeds to be derived from the sale of the Revenue Bonds, shall be paid by Authority to LAT at the Close of Escrow.

3.3   Payment of ADAP Funds After Close of Escrow.
At the Close of Escrow, Authority shall certify to the
Regional Administrator of the FAA that legal title to the
Airport Properties has passed to Authority, take all other
actions required of Authority to effect release of at least
$12.5 million of the ADAP Funds obligated for the Federal
1977-1978 fiscal year, and use its best efforts to cause the
prompt delivery of such funds.   Said funds shall be paid to
LAT, without interest, immediately upon receipt by Authority.
Authority hereby sets over, transfers and assigns to Crocker
National Bank, San Francisco Main Office, for LAT's benefit,
all right, title and interest to such payment.   Receipt of
such payment by Crocker National Bank shall be deemed to be
payment by Authority to LAT.

3.4   Payment of Balance.

(a)   The balance of the Purchase Price shall be
payable in the first instance from ADAP Funds obligated
under additional Grant Agreements.   Authority shall use its
best efforts to secure grants for Federal fiscal years 1978-
1979 and 1979-1980, each in the amount of approximatley
$11.5 million, to be made on October 1, 1978 and October 1,
1979, respectively.   If either grant or any portion thereof

shall not have been received by Authority by such dates,
Authority shall continue thereafter to use its best efforts,
at all future times: (1) to effect payment of such grants or
to obtain grants in an amount equal to the full unpaid
balance of the Purchase Price; and (2) to obtain with all
due diligence the funds necessary to pay this obligation
from all other possible sources including, but not limited
to, the sale of additional revenue bonds and grants from
appropriate state or federal agencies, but Authority shall
not be required to take any action inconsistent with opera-
tion of the Airport Properties in a reasonably prudent
manner or inconsistent with its covenants in favor of the
holders of the Revenue Bonds. Within one day of its receipt
of any such grant payment or such funds from other sources,
Authority shall pay all of such funds to LAT to be applied
against the balance of the Purchase Price. Authority hereby
sets over, transfers and assigns to Crocker National Bank,
San Francisco Main Office, for LAT's benefit, all right,
title and interest to each such payment. Receipt of each
such payment by Crocker National Bank shall be deemed to be
payment by Authority to LAT.

(b)   If the Purchase Price shall not have been
paid in full by Authority prior to October 1, 1980, Authority

9

promises to pay to LAT the full unpaid balance of the Purchase Price not theretofore paid and interest, as follows:

(i)   Interest shall accrue on the unpaid balance of the Purchase Price commencing on October 1, 1980 and continuing until the Purchase Price is paid in full, at the lesser of (i) the same rate as the net interest cost originally calculated on the Revenue Bonds, or (ii) six percent (6%) per annum.   Said interest shall be payable by Authority to LAT on the last day of December, March, June and September of each year commencing with the first payment to LAT on December 31, 1980, but only to the extent that Revenues (as such term is defined in the resolution of the Authority providing for the issuance of the Revenue Bonds) are available therefor pursuant to the terms of said resolution. Authority shall establish and collect rates and charges from users of the Airport Properties in an amount necessary to assure that sufficient Revenues are available for payment of said interest. Interest which becomes due during any twelve month period ending September 30 and which remains unpaid following that date shall thereafter bear

interest at the same rate as principal and shall continue thereafter to be immediately due and payable to LAT.

(ii)  The balance of the Purchase Price along with all accrued but unpaid interest thereon, if any, shall be due and payable on September 30, 2008; provided, however, that Authority shall pay the full amount due to LAT at an earlier date if Authority obtains the necessary funds through its exercise of best efforts as required by Section 3.4(a).

(iii)  In the event Authority fails to pay interest when due, LAT's rights and remedies here-under and at law and in equity shall not include the right to accelerate the due date of the balance of the Purchase Price.  Authority shall have the right at all times to prepay any amount due to LAT in advance of the due date of such payment without payment of any prepayment premium or bonus to LAT.

3.5   <u>Covenants by Authority</u>.

(a)   In order to aid in implementation of the promises and undertakings made in Section 3.4 by Authority, Authority agrees that it shall not, between the date hereof and the time of the payment of the balance of the Purchase Price to LAT:

(1)   without the prior written consent of LAT, which consent shall be the subject of LAT's discretion and may or may not be given, as LAT sees fit:

(A)   adopt any ordinance or resolution or make any undertaking or enter into any agreement or take any other action which restrict its legal authority to issue revenue bonds;

(B)   take any action or incur any indebted- ness which would in any way invalidate its undertakings in Section 3.4 or its performance thereunder or make such performance impossible, illegal, invalid or unenforceable; or

12

    (C) encumber or allow or suffer the encumbrance of any of the Airport Properties in any manner; or

   (2) without the prior written consent of LAT, which consent shall not be unreasonably with-held:

    (A) enter into or allow any amendment or modification of any document relating to the Revenue Bonds after final approval thereof by LAT as hereinafter provided; or

    (B) enter into or allow any amendment or modification of any provision contained in the Airline Use Agreements (described in Section 10.11 below) which relates to or affects Authority's obligations under Section 3.4 hereof after final approval thereby by LAT as hereinafter provided.

  (b) LAT hereby approves and consents to the following matters and actions as not being in violation of any of the foregoing commitments:

(1)   all obligations and undertakings of Authority contained in the documents relating to and made at or prior to the original issuance of the Revenue Bonds and all actions of Authority required for performance thereof;

(2)   all obligations and indebtedness incurred by Authority after the Close of Escrow in the ordinary course of business in connection with operation, administration, repair and maintenance of the Airport and the Airport Properties;

(3)   all liens, claims, encumbrances, leases, easements and licenses affecting the Airport Properties existing at the Close of Escrow, or incurred or entered into by Authority in the ordinary course of business subsequent to the Close of Escrow so long as no such lien, claim, encumbrance, lease, easement or license arising after Close of Escrow restricts Authority's legal authority to issue revenue bonds.

(4)   all undertakings by Authority in the Grant Agreement with the FAA identified as DOT-FA78-WE4484 and any other Grant Agreement entered into prior to the Close of Escrow provided that LAT has given its written approval thereto prior to the Close of Escrow; and

(5)   all future issuances of revenue bonds and other forms of indebtedness by Authority, provided that each such issuance is necessary to provide funds required for continued operation and maintenance of the Airport in a reasonably prudent manner or to provide funds required to fulfill Authority's obligations and undertakings in connection with the Revenue Bonds.   All other future issuances of revenue bonds and other forms of indebtedness by Authority shall require the prior written consent of LAT, which consent shall not be unreasonably withheld.

(c)   No provision of any document described in Section 12.3 hereof or attached hereto as Exhibits J through N shall in any way modify or limit any of the provisions of Section 3.   In the event of any conflict

15

between the provisions of Section 3 and the provisions of
such documents, the provisions of Section 3 shall be controlling.

4.   ESCROW.

     4.1   Escrow Holder.   Within ten business days
after the date hereof, the parties shall open an appropriate
escrow with Title Insurance and Trust Company ("Escrow
Holder") at its office at 700 Wilshire Boulevard, Los Angeles,
California 90017, to effect transfer of title to the Airport
Properties to Authority.

     4.2   Escrow Instructions.   Upon opening of escrow
each party shall deposit with Escrow Holder duly executed
escrow instructions (the "Escrow Instructions") in the form
attached hereto as Exhibit F.   In the event Escrow Holder
requires any change in the Escrow Instructions which is in-
consistent with the terms of this Agreement, the provisions
of this Agreement will be controlling as between the parties
hereto.

     4.3   Close of Escrow.   The closing of the trans-
action covered by this Agreement shall be held at the office

of Escrow Holder and shall take place simultaneously with delivery of the Revenue Bonds by Authority and receipt by Authority of the proceeds from the sale of such Revenue Bonds.  Such time of closing is referred to in this Agreement as the "Close of Escrow."  The Close of Escrow is expected to occur at 8:00 a.m. on June 15, 1978.  If the closing does not occur by 8:00 a.m. on June 30, 1978, this Agreement, the escrow and all rights and obligations of the parties hereto may be cancelled and terminated by either Authority or LAT upon giving ten (10) days advance written notice to Escrow Holder and to the other party hereto.

5.   TITLE INSURANCE AND SURVEY

5.1   Policy of Title Insurance.  Authority's title to the Real Property shall be insured by an ALTA Owner's policy of title insurance issued by Escrow Holder, containing such indorsements as may be reasonably requested by Authority, with liability in the amount of the Purchase Price showing fee title to the Real Property vested in Authority subject only to:

(a)   Taxes.  Non-delinquent general and special city and county taxes for the fiscal year 1977-78 and special assessments, if any;

17

(b)   <u>Title Report Exceptions</u>.   The liens, encumbrances, leases, licenses, easements, rights-of-way, covenants, conditions and restrictions and other exceptions described in the Title Report attached hereto as Exhibit A, except those exceptions disapproved by Authority as shown on Exhibit A-1 hereto;

(c)   <u>Date Down Exceptions</u>.   Such other matters of record as shall have been shown on a date down of the Title Report and approved by Authority in accordance with Section 5.2 below.

5.2   <u>Date Downs of Title Report</u>.   From time to time after the opening of escrow, LAT shall provide Authority with a reasonable number of date downs to the Title Report issued by Escrow Holder.   Authority shall have the right to disapprove exceptions shown on said date downs which have not been previously accepted pursuant to clauses (a) and (b) of Section 5.1 above.   Within ten (10) business days after receipt of each date down and copies of all documents of record noted as exceptions therein, Authority shall notify LAT in writing of any unacceptable exceptions in said date down so that LAT may endeavor to secure the removal thereof. Failure of Authority to disapprove in writing any new

18

exception shown on any date down within said ten (10) business days shall be deemed approval of such new exception. LAT shall have until ten (10) business days prior to the Close of Escrow to secure removal of any exception disapproved by Authority, except that (1) disapproved exceptions which may be removed solely by the payment of money by LAT may be removed by payment through escrow, and (2) LAT's failure to remove exception 40 and the exceptions described in paragraph 2 of Exhibit A-1 hereto shall not affect Authority's obligation to perform this Agreement.

    5.3 _Survey_. Authority and LAT have approved a survey of the Real Property by Pafford & Associates dated July 15, 1977 (revised to August 18, 1977). Authority and LAT have received a revised survey certified as of March 22, 1978, which has been prepared for use with the ALTA policy of title insurance to be received by Authority at Close of Escrow.

6.   REPRESENTATIONS AND WARRANTIES OF LAT

    LAT hereby represents and warrants to Authority that except as set forth in Exhibit G hereto:

6.1   <u>Organization, Standing, and Qualification</u>.
LAT and Lockheed are corporations duly organized, validly
existing and in good standing under the laws of the States
of Delaware and California, respectively, and have the full
corporate power and authority to enter into this Agreement
and to consummate the transactions contemplated hereby.   LAT
is duly qualified to do business in and is in good standing
in the State of California.

6.2   <u>Agreement Will Not Cause Violation or Breach</u>.
The execution and delivery of this Agreement do not, and the
consummation of the transactions contemplated hereby will
not, violate any provision of LAT's or Lockheed's Articles
of Incorporation or By-Laws, or any provision of any law,
regulation, mortgage, lien, lease, agreement, instrument,
court or governmental order, arbitration award, judgment or
decree to which LAT or Lockheed is a party or by which
either is bound.

6.3   <u>Authorization</u>.   The execution and delivery
of this Agreement to Authority and the transactions contem-
plated hereby have been duly authorized by all required
corporate action by the directors and shareholder of LAT and
by the directors of Lockheed and do not require approval by
the shareholders or the outstanding shares of Lockheed.

6.4    Title to Airport Properties.    LAT has, or by
the Close of Escrow will have, good and marketable title to
the Easements described in Exhibit C hereto, the Equipment,
the Airport Leases and the Operating Permit, free and clear
of all mortgages, deeds of trust, liens, pledges, security
interests, charges or other encumbrances of any nature
whatsoever, except that such representation is made with
respect to the Operating Permit only to the extent that
applicable law permits a private party to hold and transfer
legal title therein.

6.5    Litigation and Compliance With Laws.

(a)    LAT is not charged with a violation of
any law, ordinance, regulation, requirement, order,
writ, injunction or decree of any court or governmental
instrumentality applicable to the Airport Properties or
the operation of the Airport;

(b)    To the knowledge of LAT, there is no
suit or action, or legal, administrative, arbitration
or other proceeding pending or threatened which might
materially and adversely affect the Airport Properties,
the continued operation of the Airport in its present

mode or LAT's right to consummate the transactions con-
templated by this Agreement;

(c)   LAT has no knowledge of any pending
governmental investigation relating to, or any basis or
grounds for, any charge of violation, suit, action or
proceeding of the type described in subsections (a) and
(b) above; and

(d)   LAT has no knowledge of any pending
change in the City of Los Angeles zoning or building
ordinances affecting the Real Property, the Easements
or the Airport Leases.

6.6   Absence of Default.   To the knowledge of LAT,
LAT is not in default in the performance, observance or
fulfillment of any material obligation, covenant or condition
contained in any lease, contract, commitment or agreement
relating to operation of the Airport.

6.7   Restrictions.   LAT is not subject to any
judgment, order, writ, injunction or decree, which materially
and adversely affects or, so far as LAT can now foresee, may
in the future materially and adversely affect, the Airport

Properties or the continued operation of the Airport in its present mode.

    6.8  Easements.  The list of Easements set forth in Exhibit C hereto is a complete list of all easements and other rights which affect property owned by others, which pertain to operation of the Airport and the Airport Properties, and which are for the benefit of or are held in the name of LAT, Lockheed or any affiliate of either of them. Said Easements are in full force and effect, the present owners or holders thereof have not defaulted on any obligations or waived any rights which will affect the enforceability thereof, and LAT, having made an inspection of the properties subject to such easements, has no knowledge of any prescriptive or implied rights which have vested affecting the use or enjoyment of said Easements.

    6.9  Condition of Buildings and Equipment.  The buildings, structures and other improvements on the Real Property and the Equipment are in as good working order and condition, ordinary wear and tear excepted, as existed on March 31, 1977, the date of the appraisal of the Airport Properties prepared for the FAA by International Research & Appraisal Company.

6.10   <u>Enforceability of Airport Leases; No Default</u>.
The Airport Leases are in full force and effect; provided,
however, that LAT has terminated certain Airport Leases
effective as of April 30, 1978, as designated on Exhibit E
hereto.   LAT has performed all of its material obligations
and duties under the Airport Leases.   To the best of LAT's
knowledge, Pacific Southwest Airlines, Hughes Air West,
Continental Airlines and Tiger Air have performed their
respective material obligations and duties under the Airport
Leases to which each is a party.

6.11   <u>Contracts and Commitments</u>.   Neither LAT nor
Lockheed is a party to any written or oral contract which
extends beyond the Close of Escrow and which relates to the
Airport Properties or the operation of the Airport.

6.12   <u>Governmental Consents and Approvals</u>.   Except
for a permit from the FAA, the Operating Permit and the
release of a lien by the General Services Administration, no
consent, approval or permit from any governmental instrumen-
tality is required for operation of the Airport in its
present mode or required to be obtained by LAT for the
transfer of the Airport Properties to Authority.

6.13  Ownership of LAT.  Lockheed is the record and beneficial owner of all capital stock of and all voting power in LAT; provided, however, that Lockheed's beneficial ownership of such stock is subject to a Credit Agreement Amended and Restated in favor of certain banks dated as of October 14, 1977.

7.  REPRESENTATIONS AND WARRANTIES OF AUTHORITY

Authority hereby represents and warrants to LAT that, except as set forth on Exhibit H hereto:

7.1  Organization and Authority of Authority. Authority is a public entity duly organized and validly existing under Chapter 5, Division 7, Title 1 of the California Government Code and has full power and authority to enter into this Agreement and to purchase the Airport Properties. The execution and delivery of this Agreement to LAT and the purchase of the Airport Properties have been duly authorized by Authority and the cities of Burbank, Glendale and Pasadena.

7.2  Validity of Contemplated Transaction.  Neither the execution and delivery of this Agreement nor the purchase of the Airport Properties will violate any provision

of the joint exercise of powers agreement under which Authority was created or any statute, regulation, charter provision, ordinance, court or governmental order, arbitration award, judgment or decree binding upon Authority or upon the cities of Burbank, Glendale and Pasadena.

### 7.3.  Litigation.

(a)  To the knowledge of Authority, there is no suit or action, or legal, administrative, arbitration or other proceeding pending or threatened which might materially and adversely affect the legal or financial capacity of Authority to sell the Revenue Bonds, enter into the Grant Agreements or perform its obligations hereunder;

(b)  Authority has no knowledge of any pending governmental investigation relating to, or any basis or grounds for, any suit, action or proceeding of the type described in subsection (a) above; and

(c)  There is no decree, writ, injunction or order of any court or governmental instrumentality outstanding or, to the knowledge of Authority, threatened,

which would have the effects described in subsection (a) above.

7.4   Liabilities of Authority.   Authority has not incurred any debt, liability or obligation of any nature, whether due or to become due, that materially and adversely affects or, as Authority can now foresee, may in the future materially and adversely affect Authority's ability to sell the Revenue Bonds or to enter into the Grant Agreements as contemplated.

7.5   Continued Existence of Authority.   Authority shall not be dissolved, nor have its existence otherwise terminated by the cities of Burbank, Glendale and Pasadena at any time prior to receipt by LAT of the entire amount of the Purchase Price and interest, if any, whether in the form of ADAP funds or otherwise.

8.   CONDUCT OF BUSINESS PENDING CLOSE OF ESCROW.

From the date hereof to the Close of Escrow, LAT shall conduct the business of operating the Airport as follows:

8.1  <u>Business in the Ordinary Course</u>.  LAT shall not engage in transactions or enter into agreements involving or affecting the Airport Properties other than in the ordinary course of business, except as expressly permitted by this Agreement or by the advance written approval of Authority.

8.2  <u>Maintenance of Property</u>.  Subject to the provisions of Section 14 of this Agreement, LAT will maintain the Airport Properties in as good working order and condition, ordinary wear and tear excepted, as existed on March 31, 1977, the date of the appraisal of the Airport Properties prepared for the FAA by International Research & Appraisal Company.

8.3  <u>Insurance</u>.  LAT will continue to maintain the insurance coverage now in effect on the Airport Properties.

8.4  <u>Litigation During Interim Period</u>.  LAT will promptly advise Authority in writing of the commencement or threat, of which LAT receives notice, against LAT or Lockheed of any claim, investigation, litigation or proceeding affecting any of the Airport Properties, the operation of the Airport or the transactions contemplated by this Agreement, except for personal injury matters covered by LAT's liability insurance.

8.5  Access.  Authority and its officers, at-
torneys, accountants, engineers, consultants and other
representatives shall be permitted, during regular business
hours, to examine the property, books and records of LAT
relating to the Airport Properties and operation of the
Airport (except for fuel services) and to make copies thereof.
Such persons shall be afforded escorted access to such
property, books, and records, and LAT will upon request
furnish Authority with any information reasonably required
with respect to its property, assets and business; provided,
however, that any furnishing of such information to Authority
or any investigation by Authority shall not affect Authority's
right to rely on the representations and warranties made by
LAT in this Agreement; and provided, further, that Authority
and all others given access as representatives of Authority
will hold in strict confidence all documents and information
concerning LAT so furnished as well as all such documents
and information heretofore furnished to Authority by LAT
(except that Authority may disclose such documents and
information as required by law and to the FAA, the California
Department of Transportation and the city councils of the
cities of Burbank, Glendale and Pasadena, and except to the
extent that such information can be shown to be (a) previously
known to Authority by reason other than access granted by

LAT prior to the date hereof, (b) in the public domain or
(c) acquired by Authority from other legitimate sources).
If the transactions contemplated by this Agreement shall not
be consummated, such confidence shall be maintained and all
such documents shall immediately thereafter be returned to
LAT.

    8.6   <u>Business Relations</u>.   LAT will use its best
efforts to preserve its relations with its tenants, customers,
suppliers and others having business relations with it with
respect to operation of the Airport including, but not
limited to, the extension through June 30, 1978, of those
Airport Leases which have been terminated as of April 30,
1978.

    8.7   <u>Consent of Lenders and GSA</u>.   LAT shall use
its best efforts to obtain prior to the Close of Escrow the
consent of the banks referred to in Paragraph 11.6 hereof
and a release of the lien in favor of the General Services
Administration referred to in Paragraph 11.7 hereof.

9.   OBLIGATIONS OF AUTHORITY PENDING CLOSE OF ESCROW

9.1   Authority's Entitlements to Use.   Prior to the Close of Escrow, Authority shall use its best efforts to obtain all consents, approvals, franchises, licenses, permits, rights of way, easements, operating rights and other entitlements to use referred to in Section 10.6 hereof.

9.2   Sale of Revenue Bonds.   As soon as reasonably practicable after the execution and delivery of this Agreement, Authority shall use its best efforts to complete or cause to be completed all studies, to adopt all resolutions, to cause to be enacted all ordinances, and to take or cause to be taken all other actions necessary to enable Authority to sell and deliver the Revenue Bonds and then to sell and deliver the Revenue Bonds; provided, however, that if the Revenue Bonds cannot be sold at or below the interest rate stated in Section 10.8 hereof and in an amount necessary to yield net proceeds in the amount stated in Section 10.8, Authority may decline to sell and deliver the Revenue Bonds.

9.3   Litigation During Interim Period.   Authority will promptly advise LAT in writing of the commencement or threat, of which Authority receives notice, against Authority

or the city of Burbank, Glendale or Pasadena of any claim, investigation, litigation or proceeding affecting the formation of Authority, the operation of the Airport by Authority after the Close of Escrow or the transactions contemplated by this Agreement.

10.  CONDITIONS PRECEDENT TO AUTHORITY'S OBLIGATIONS

All obligations of Authority under this Agreement are subject to the fulfillment of each of the following conditions, unless waived in writing by Authority prior to the Close of Escrow:

10.1  Representations and Warranties.  The representations and warranties made by LAT in this Agreement or in any list, certificate or document delivered pursuant to the provisions hereof shall be true at and as of the time of the Close of Escrow as though such representations and warranties were made at and as of such time (except to the extent that they are stated herein or therein to be true as of some other date).  LAT shall deliver to Authority a certificate to such effect dated the Close of Escrow and signed by its Chairman of the Board or President.

10.2   <u>Compliance With Agreements</u>.   LAT shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Close of Escrow.   LAT shall have delivered to Authority a certificate to such effect dated the Close of Escrow and signed by its Chairman of the Board or President.

10.3   <u>Opinion of Counsel</u>.   LAT shall have delivered to Authority an opinion of its counsel, O'Melveny & Myers, Los Angeles, California, dated the Close of Escrow in form and substance satisfactory to Authority to the effect that:

(a)   LAT's and Lockheed's existence, good standing, corporate power, authority and qualification to do business are as stated in Section 6.1 hereof;

(b)   Assuming due execution and delivery of this Agreement by the Authority and that this Agreement is a valid and binding obligation of the Authority, this Agreement has been duly executed and delivered by LAT and constitutes a legally valid and binding obligation of LAT, enforceable

in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or equitable principles relating to or limiting creditors' rights generally, and except that no opinion need be expressed as to the availability of equitable remedies;

(c)  The execution, delivery and performance of this Agreement by LAT does not violate any provision of the Articles of Incorporation or By-Laws of LAT or Lockheed, any provision of the Credit Agreement as Amended and Restated as of October 14, 1977, among Lockheed and twenty-four banks, or to the best of such counsel's knowledge, any provision of any agreement to which LAT is a party or by which LAT is bound, any law, or any judicial or governmental decree, order or judgment naming LAT as a party of which counsel is aware;

(d)  All other actions and proceedings required by law or by this Agreement to be taken by LAT or Lockheed at or prior to the Close of Escrow in connection with this Agreement and the

transactions provided for herein have been duly and validly taken.

LAT shall have delivered to Authority an opinion of Robert C. Gusman, Esq. dated the Close of Escrow, in form and substance satisfactory to Authority to the effect that, except as disclosed pursuant to this Agreement, such counsel knows of no litigation, proceeding or investigation pending or threatened against LAT or Lockheed which would adversely affect the Airport Properties or LAT's operation of the Airport or its right to consummate the transactions contemplated hereby, and, to the knowledge of such counsel, none of the operations of LAT are in violation of any existing law, rule or regulation which would adversely affect the Airport Properties or the operation of the Airport.

Such opinions shall not be unsatisfactory to Authority by reason of any qualification therein relating to the effect of Los Angeles Superior Court Case No. C 207043, any appeal from the judgment entered in such action or United States District Court for the Central District of California Case No. 77-3868-IH.

In furnishing such opinions, counsel may rely upon certificates of officers of LAT and Lockheed as to factual matters and certificates of public officials, copies of which shall be attached to such opinions.

10.4   Title Insurance and Survey.   Authority shall have received from Escrow Holder adequate assurance that Escrow Holder will issue the title insurance policy described in Section 5.1 hereof promptly after recordation of LAT's grant deed.   Authority shall have approved in writing the final survey of the Real Property to be used in connection with said policy of title insurance and the legal description to be contained in said policy.

10.5   Litigation Affecting Closing.   No injunction, temporary restraining order, judgment or other order of any court or governmental agency or instrumentality shall have been issued or been entered which would be violated by the consummation of the transactions contemplated hereby.

10.6   Consents, Approvals and Operating Rights. Authority shall have received all consents and approvals of third parties, including governmental entities, necessary for the assignment or transfer to Authority of the Airport Properties and operation of the Airport.

10.7   <u>Execution of Grant Agreements</u>.   Authority and FAA shall have entered into Grant Agreements for at least $12.5 million of funding assistance for the Federal fiscal year 1977-1978.

10.8   <u>Sale of Revenue Bonds</u>.   Authority shall have completed the sale of Revenue Bonds at a net interest cost not to exceed seven percent (7%) per annum and shall have received net proceeds (defined as gross proceeds less all costs of issuance, funded interest, reserve funds and reimbursement of the cities of Burbank, Glendale and Pasadena for advances to the Authority) from the sale of the Revenue Bonds in an amount no less than $15,718,773.

10.9   <u>Agreement with Lockheed</u>.   Lockheed and Authority shall have entered into an agreement in the form attached hereto as Exhibit I, and Lockheed shall have performed and complied with all agreements and conditions required by such agreement to be performed or complied with by Lockheed prior to or at Close of Escrow.

10.10  <u>Banks' Consent</u>.   A majority of the twenty-four banks that, with Lockheed, are party to that certain Credit Agreement as Amended and Restated as of October 14,

1977, shall have consented to the transactions contemplated hereby, and LAT shall have delivered evidence of such consent to Authority.

10.11  <u>Airline Use Agreements</u>.  The Authority and Pacific Southwest Airlines, Continental Airlines and Hughes Air West shall have executed and delivered Airline Use Agreements.

10.12  <u>Closing Documents</u>.  LAT shall have delivered to Escrow Holder the documents described in Sections 12.1 and 12.3 of this Agreement.

11.  <u>CONDITIONS PRECEDENT TO OBLIGATIONS OF LAT</u>

All obligations of LAT under this Agreement are subject to the fulfillment of each of the following conditions, unless waived in writing by LAT prior to Close of Escrow:

11.1  <u>Representations and Warranties</u>.  Authority's representations and warranties contained in this Agreement or in any certificate or document delivered pursuant to the provisions hereof shall be true at and as of the time of

Close of Escrow as though such representations and warranties were made at and as of such time (except to the extent that they are stated herein or therein to be true as of some other date). Authority shall deliver to LAT a certificate dated the Close of Escrow and signed by its President to such effect.

11.2 <u>Compliance With Agreements</u>. Authority shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at Close of Escrow. Authority shall have delivered to LAT a certificate dated the Close of Escrow and signed by its President to such effect.

11.3 <u>Opinions of Counsel</u>. Authority shall have delivered to LAT an opinion of its counsel, Lillick McHose & Charles, Los Angeles, California, dated Close of Escrow, in form and substance satisfactory to LAT, to the effect that:

(a) Authority's existence, power and authority are as stated in Section 7.1 hereof;

(b) Assuming due execution and delivery of this Agreement by LAT and that this Agreement is a

valid and binding obligation of LAT, and assuming due execution and delivery of Grant Agreements by the FAA and that such agreements constitute valid and binding obligations of the FAA, this Agreement and the Grant Agreements for the federal fiscal year 1977-1978 have been duly executed and delivered by Authority and constitute valid and binding obligations of Authority, enforceable in accordance with their terms except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or equitable principles relating to or limiting creditors' rights generally and except that no opinion need be expressed as to the availability of equitable remedies;

(c) The execution, delivery and performance of this Agreement by Authority does not violate any provision of the joint exercise of powers agreement among the cities of Burbank, Glendale and Pasadena forming Authority, or to the best of such counsel's knowledge, any provision of any agreement to which Authority is a party or by which it is bound, or any law, or any judicial or governmental decree, order or judgment naming Authority as a party of which counsel is aware;

(d)   All other actions and proceedings required by law or by this Agreement to be taken by Authority at or prior to Close of Escrow in connection with this Agreement and the transactions provided for herein (except for actions and proceedings in con-nection with the authorization, issuance and sale of the Revenue Bonds) have been duly and validly taken; and

(e)   Except as disclosed pursuant to this Agreement, such counsel knows of no litigation, pro-ceeding or investigation pending or threatened against Authority which would adversely affect the legal capacity of Authority to sell the Revenue Bonds, to enter into the Grant Agreements or to consummate the transactions contemplated hereby.

Such opinion shall not be unsatisfactory to LAT by reason of any qualification therein relating to the effect of Los Angeles County Superior Court Case No. C 207043, any appeal from the judgment entered in such action or United States District Court for the Central District of California Case No. 77-3868-IH.

41

Authority shall have delivered to LAT a copy of the legal opinion of its bond counsel, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, California, in the form delivered to the purchaser or purchasers of the Revenue Bonds.

Authority shall have delivered to LAT legal opinions of the City Attorneys of the Cities of Burbank, Glendale and Pasadena, California, dated Close of Escrow, in form and substance satisfactory to LAT, to the effect that with respect to the city to which each of such opinions relates:

(a)  The execution, delivery and performance of this Agreement by Authority does not violate any provision of the charter or ordinances of such city, or to the best of such counsel's knowledge, any provision of any agreement to which such city is a party or by which it is bound, or any judicial or governmental de-cree, order or judgment naming such city as a party of which counsel is aware;

(b)  All actions and proceedings required by law or by this Agreement to be taken by such city at or

42

prior to Close of Escrow in connection with this Agreement and the transactions provided for herein have been duly and validly taken; and

(c)   Except as disclosed pursuant to this Agreement, such counsel knows of no litigation, proceeding or investigation pending or threatened against such city which would adversely affect the legal capacity of Authority to sell the Revenue Bonds, to enter into the Grant Agreements or its right to consummate the transactions contemplated hereby.

Such opinions shall not be unsatisfactory to LAT by reason of any qualification therein relating to the effect of Los Angeles County Superior Court Case No. C 207043, any appeal from the judgment entered in such action or United States District Court for the Central District of California Case No. 77-3868-IH.

In furnishing the opinions required by this Section 11.3, counsel may rely upon certificates of officers of Authority and officials of the three cities as to factual matters and certificates of public officials, copies of which shall be attached to such opinions.

11.4   <u>Litigation Affecting Acquisition</u>.   No injunction, temporary restraining order, judgment or other order of any court or governmental agency or instrumentality shall have issued or been entered which would be violated by the consummation of the transactions contemplated hereby.

11.5   <u>Grant Agreements</u>.   Authority and FAA shall have entered into Grant Agreements for at least $12.5 million of funding assistance for federal fiscal year 1977-1978, and the conditions of such Grant Agreements required to be fulfilled prior to or at Close of Escrow shall have been satisfied.

11.6   <u>Banks' Consent</u>.   A majority of the twenty-four banks that, with Lockheed, are parties to that certain Credit Agreement as Amended and Restated as of October 14, 1977, shall have consented to the transactions contemplated hereby.

11.7   <u>Release of GSA Lien</u>.   LAT shall have secured the release by the United States of America, acting through the General Services Administration, of its security interest in certain portions of the Airport Properties, as more particularly described in Exhibit A hereto.

11.8   Revenue Bond Documents.   LAT shall have approved the provisions of the resolution of Authority authorizing the issuance of the Revenue Bonds and in all other documents pertaining thereto (LAT's failure to disapprove in writing any such undertaking or obligation within five (5) business days after delivery during normal business hours of relevant documents to LAT shall be deemed approval thereof).

11.9   Airline Use Agreements.   LAT shall have approved those provisions of the Airline Use Agreements (described in Section 10.11 above) relating to Authority's obligations under Section 3.4 hereof (LAT's failure to disapprove in writing any such provision within two business days after delivery during normal business hours of such provision to LAT shall be deemed approval thereof).

11.10  Survey and Legal Description.   LAT shall have approved in writing the final survey of the Real Property to be used in connection with the title insurance policy described in Section 5.1 hereof and the legal description to be contained in said policy.

11.11 <u>Closing Documents</u>.  Authority shall have delivered to Escrow Holder the documents described in Sections 12.2 and 12.3 of this Agreement.

12. <u>DOCUMENTS TO BE DELIVERED TO ESCROW HOLDER PRIOR TO CLOSE OF ESCROW</u>

12.1 <u>Documents to be Delivered by LAT</u>.  LAT shall deliver to Escrow Holder at least five business days prior to the Close of Escrow the following documents for delivery to Authority at the Close of Escrow, all of which shall be in form and substance satisfactory to Authority:

(a) <u>LAT's Deed</u>.  A grant deed conveying title to the Real Property to Authority;

(b) <u>Easements</u>.  Such deeds, assignments and other instruments of conveyance necessary to transfer all of LAT's right, title and interest to the Easements to Authority;

(c) <u>Equipment</u>.  A Bill of Sale conveying and transferring all of LAT's right, title and interest in and to the Equipment to Authority;

(d)  Airport Leases.  A duly executed and acknowledged assignment to Authority of all of LAT's right, title and interest in and to the Airport Leases, together with executed originals of all Airport Leases and amendments thereto (or, where originals are not available, copies thereof certified to be true copies by an officer of each of the parties thereto);

(e)  Operating Permit.  The Operating Permit along with a certificate to the California Director of Aeronautics setting forth the date of transfer of title to the Airport Properties to Authority;

(f)  Resolutions.  All directors' and shareholders' resolutions authorizing the execution, delivery and performance of this Agreement, all of which shall be certified by the Secretaries of LAT and Lockheed, as the case may be;

(g)  Letter of Credit.  The letter of credit required by Exhibit H attached hereto;

(h)   Other Documents.  Certificates of Incumbency to evidence the authority of persons acting on behalf of LAT and the legal opinions, certificates and other documents required to be delivered by LAT pursuant to Section 10 hereof.

LAT shall deliver copies of the above documents to counsel for Authority at the time they are delivered to Escrow Holder.

12.2   Documents to be Delivered by Authority.  Authority shall deliver to Escrow Holder at least five days prior to Close of Escrow the following documents for delivery to LAT at Close of Escrow, all of which shall be in form and substance satisfactory to LAT:

(a)   Assumption Agreement.  An Assumption Agreement whereby Authority assumes all of LAT's rights and obligations under the Airport Leases which arise or accrue after Close of Escrow  under the terms of such Airport Leases.

(b)   Resolutions.  Resolutions, duly certified, of Authority and the governing bodies of the

Cities of Burbank, Glendale and Pasadena consenting to and authorizing the purchase of the Airport Properties as set forth herein and the execution, delivery and performance of this Agreement;

(c)  Operating Certificate.  Copy of federal airport operating certificate issued to Authority by the FAA.

(d)  FAA Documents.  The certificate called for by Section 3.3 hereof, a voucher or other appropriate instrument requesting payment of the ADAP Funds re-ferred to in Section 3.3, and all other documents required to be delivered by Authority in order to obtain release of said funds.

(e)  Other Documents.  Certificates of In-cumbency to evidence the authority of persons acting on behalf of Authority and the legal opinions, certificates and other documents required to be delivered by Authority pursuant to Section 11 hereof.

Authority shall deliver copies of the above documents to counsel for LAT at the time they are delivered to Escrow Holder.

49

12.3  <u>Related Agreements to be Executed and
Delivered at Close of Escrow</u>.  Authority, Lockheed and LAT
shall deliver to Escrow Holder executed originals of the
following documents for delivery at the Close of Escrow, all
of which are to be dated as of Close of Escrow and substan-
tially in the form attached hereto as Exhibits J through N
and as further agreed upon by the parties:

(a)  <u>Real Property Leases</u>.  Leases of certain
parts of the Real Property, made by and between Authority,
Lockheed and LAT;

(b)  <u>Airport Facilities Use Agreement</u>.  An
agreement for use of certain Airport facilities, made
by and between Authority and Lockheed;

(c)  <u>Fueling Services Agreements</u>.  Agreements,
made by and between Authority and LAT relating to the
delivery of fuel services at the Airport by LAT;

(d)  <u>Airport Services Agreement</u>.  An operating
contract, made by and between Authority and LAT, pro-
viding for the operation of the Airport by LAT under
the direction and control of Authority; and

(e)  <u>Agreement for Crash-Fire-Rescue Services</u>.
An Agreement between Authority and Lockheed relating to
Crash Fire and Rescue Services.

50

No provision of any of the foregoing documents shall in any way modify or limit any provision of Sections 2, 16 and 18.4 of this Agreement. In the event of any conflict between the provisions of such documents and the provisions of such Sections, the provisions of such Sections shall be controlling.

13. <u>POSSESSION; PRORATIONS; RENTALS</u>.

13.1 <u>Possession</u>. Authority shall be entitled to, and LAT shall deliver, possession and control of the Airport Properties at Close of Escrow, subject, however, to the rights of any tenants or licensees in possession of any portion of the Airport Properties pursuant to the Airport Leases. Upon such delivery of possession, Authority and LAT shall conduct a joint physical inventory of the Equipment, and LAT shall replace (or deliver substitute items of like kind and quality) any and all items of Equipment not located on the Airport Properties as shown by such physical inventory. Such Equipment shall be replaced or delivered within a reasonable time after completion of such inventory.

13.2 <u>Prorations</u>. Real property taxes and special assessments attributable to the Real Property and premiums on any insurance on the Airport Properties assumed by Authority shall be prorated to Close of Escrow on the basis of a 30-day month and a 360-day year, provided, however, that Authority's obligation to pay any amount to LAT attributable to

51

real property taxes and special assessments attributable to that portion of the Real Property located in the City of Burbank shall be limited to prompt delivery to LAT of any refund obtained in the manner provided in the next sentence. After Close of Escrow, Authority and LAT shall use their best efforts to obtain a refund of property taxes and assessments paid by LAT on the portion of the Real Property located in the City of Burbank and attributable to the period from Close of Escrow through June 30, 1978.

13.3  Rentals.  Non-delinquent rentals shall be prorated to Close of Escrow on the basis of a 30-day month. All refundable security or cleaning deposits under the Airport Leases shall be deposited by LAT into Escrow for delivery to Authority at Close of Escrow.  Rentals delinquent at Close of Escrow but received by Authority or LAT after Close of Escrow shall be prorated upon receipt in the same manner as non-delinquent rentals, and the recipient shall deliver to the other party its pro rata portion thereof no later than three (3) days after receipt.

14.  DAMAGE TO AIRPORT PROPERTIES

14.1  Risk of Loss on LAT.  The risk of any loss resulting from the damage or destruction of any of the

52

Airport Properties prior to Close of Escrow by any cause whatsoever (hereafter referred to as a "Loss") shall be on LAT, whether or not such Loss is due to the fault of LAT, unless such Loss is proximately caused by the acts or omissions of Authority or its representatives.

14.2  Loss Prior to Close of Escrow.  In the event of any Loss prior to Close of Escrow, LAT shall immediately begin all steps necessary to repair or replace the damaged or destroyed Airport Properties, and such Airport Properties shall be promptly repaired or replaced by LAT at its expense to the condition of such Airport Properties immediately preceding such Loss consistent with all applicable building codes.  LAT's obligations of repair and replacement under this Section 14.2 shall survive the Close of Escrow.  In the event the Loss causes a material disruption of Airport operation, the time for Close of Escrow shall be extended until such time as normal Airport operations have resumed for a period of at least seven (7) days; provided, however, if normal Airport operations are not resumed by August 31, 1978, Authority may, at its option and without any liability to LAT, terminate this Agreement by delivery of written notice to LAT.

53

15.   NONASSUMPTION OF LIABILITIES AND INDEMNIFICATION

  15.1   No Assumption of Liabilities.   Authority does not assume and shall not be liable for any obligations or liabilities of or claims against LAT or Lockheed whatsoever (except as expressly provided in the Assumption Agreement delivered at Close of Escrow pursuant to Section 12.2(a) of this Agreement), or any liabilities or claims arising out of or related to the Airport Properties or operation of the Airport prior to Close of Escrow.   Except as may be provided for in the agreements described in Section 12.3 of this Agreement, LAT and Lockheed do not assume and shall not be liable for any obligations or liabilities of or claims against Authority whatsoever, or any liabilities or claims arising out of or related to the Airport Properties or operation of the Airport after the Close of Escrow.

  15.2   Indemnification

   (a)   LAT shall defend, indemnify and save harmless Authority, its members, officers, employees and agents, and the cities of Burbank, Glendale and Pasadena, their officials, employees and agents, against any and all losses, damages, claims, liabilities, obligations, actions,

proceedings, costs and expenses, including attorneys fees, which said persons or entities may hereafter suffer, incur, be put to, pay or lay out by reason of (1) any claim, proceeding or investigation arising or alleged to arise out of or be related to the use, ownership or operation of the Airport and Airport Properties by LAT, Lockheed or any affiliate of either of them prior to Close of Escrow, or (2) the inaccuracy, or the breach by LAT, of any representation or warranty which LAT has made or agreed to hereunder.  Nothing contained herein shall require LAT to defend, indemnify or save harmless any of the persons or entities identified in this Section 15.2(a) if such claim, liability, obligation, action or proceeding arises out of or results from acts or omissions of such persons or entities.

(b)  Authority shall defend, indemnify and save harmless LAT, its officers, employees and agents, and Lockheed, its officers, employees and agents, against any and all losses, damages, claims, liabilities, obligations, actions, proceedings, costs and expenses, including attorneys fees, which said persons or entities may hereafter suffer, incur, be put to, pay or lay out by reason of (1) any claim, proceeding or investigation arising or alleged to arise out of or be related to the use, ownership or operation of the

55

Airport and Airport Properties by Authority after Close of Escrow, or (2) the inaccuracy, or the breach by Authority, of any representation or warranty which Authority has made or agreed to hereunder, but subject in all cases to the prior rights of the holders of the Revenue Bonds to be paid pursuant to the resolution of the Authority authorizing the issuance of the Revenue Bonds.  Nothing contained herein shall require Authority to defend, indemnify or save harmless any of the persons or entities identified in this Section 15.2(b) if such claim, liability, obligation, action or proceeding arises out of or results from (i) acts or omissions of LAT or Lockheed, or any officer, employee or agent thereof, including but not limited to acts or omissions of LAT or Lockheed under or in connection with any of the agreements described in Section 12.3 hereof (except as expressly set forth in said agreements), or (ii) the use of the Airport by LAT or Lockheed.

(c)  Authority reserves the right, should it elect to do so, to appoint separate legal counsel to act as associate counsel to attorneys selected by LAT during the pendency of any claim, proceeding or investigation referred to in Section 15.2(a) of this Agreement.  In that event, said legal expense of counsel appointed by Authority shall

be for the account of Authority.  Any such appointment of separate counsel shall not affect LAT's obligations to Authority under Section 15.2(a).

16.  FURTHER ASSURANCES

Each party hereto at its expense shall, from time to time, and at the request of the other party hereto (whether such request is made prior to, at or after Close of Escrow), execute and deliver such further instruments of transfer and will take such other reasonable actions, as requested, to confirm the transfer of the Airport Properties.  LAT's obligation hereunder shall include, but not be limited to, the quitclaim to Authority of any avigation easements that hereafter may be acquired by LAT in any manner affecting property owned by persons other than LAT and relating to operation of the Airport.  Moreover, after Close of Escrow, the parties shall cooperate with one another in allocating to their respective properties and businesses the cost and expenses of any electricity, water, gas and other utilities and service provided to the Airport and its environs that are not separately metered.

17.  RELOCATION ASSISTANCE BENEFITS

LAT is aware that it could be entitled to reloca-tion assistance benefits under the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 (42 U.S.C. §4601 et. seq.) and the Relocation Assistance Law (California Government Code §7260 et. seq.) in connection with the consummation of the transactions contemplated by this Agreement. LAT represents and warrants that the Purchase Price includes compensation for any expenses or losses covered by such laws and waives any further rights it may have under such laws.

18.  MISCELLANEOUS PROVISIONS

18.1  Brokers.  Each of the parties hereto repre-sents to the other that it has not dealt with any broker or finder in connection with any of the transactions contem-plated by this Agreement and has not entered into any agree-ment or incurred any obligation which might result in an obligation to pay a sale or brokerage commission or finder's fee on any of the transactions contemplated by this Agree-ment, and, insofar as such party has actual knowledge, no broker or other person is entitled to any commission or finder's fee in connection with any of such transactions.

18.2  Notices.  All communications, notices and demands of any kind which either party to this Agreement may be required or desire to give to or serve upon the other party, shall be made in writing (with a copy to Escrow Holder, if prior to Close of Escrow) and delivered by personal service to an officer of each other party or sent by telegram or by registered or certified mail, postage paid, return receipt requested to the following addresses:

To Authority:

Hollywood-Burbank
Airport Authority
2627 Hollywood Way
Burbank, CA 91505
Attn:  Michael R. McClintock

With a copy to:

Lillick McHose & Charles
707 Wilshire Boulevard
Los Angeles, CA 90017
Attn:  Thomas H. Durff

To LAT:

Lockheed Air Terminal, Inc.
Box 7229
Burbank, CA 91510
Attn:  D. M. Simmons

With copies to:

Robert C. Gusman, Esq.
Bldg. #9
Hollywood-Burbank Airport
2627 No. Hollywood Way
Burbank, CA 91520

O'Melveny & Myers
611 West Sixth Street
Los Angeles, CA 90017
Attn:  F. J. Burgweger

A party may change its address by giving the other party written notice of its new address as herein provided.

59

18.3   <u>Successors and Assigns</u>.  No party hereto may assign, hypothecate or otherwise transfer this Agreement or its interest or rights herein or obligations hereunder, and any attempted assignment, hypothecation or other transfer shall be void unless the prior written approval of the other party is obtained, which approval shall not be unreasonably withheld.  Subsequent to the Close of Escrow, LAT may assign, hypothecate or otherwise transfer this Agreement, LAT's interest, or rights herein or obligations hereunder to Lockheed or any subsidiary or affiliate of Lockheed, without any requirement for Authority to approve such transaction; provided, however, that no such assignment, hypothecation or transfer shall relieve LAT of any obligations hereunder.  Subject to the foregoing, this Agreement shall be binding upon the successors and assigns of the parties hereto.

18.4   <u>Survival of Representations, Warranties and Covenants</u>.  Except as otherwise provided in this Agreement, all representations, warranties, covenants and agreements of each party set forth in this Agreement or in any schedule, certificate, document or list delivered by any such party shall survive Close of Escrow.  Notwithstanding any investigation conducted before or after Close of Escrow or the decision of any party to complete Close of Escrow, the parties hereto shall be entitled to rely upon the representations and warranties set forth in this Agreement.

18.5   Expenses.   Authority shall pay one-half of the escrow fee charged by Escrow Holder, that portion of the title insurance premium attributable to the issuance of an ALTA policy rather than a CLTA policy and any additional recording and escrow fees attributable solely to transfer of title to the City of Burbank pursuant to Section 1.2 hereof. LAT shall pay one-half of the escrow fee, the remainder of the title insurance premium, all recording costs and all applicable sales, use, documentary transfer and other taxes due, if any, as a result of its transfer of the Airport Properties to Authority.   Any real property taxes and assessments on the Airport Properties levied after the Close of Escrow and any other taxes relating to operation thereof after the Close of Escrow shall be paid by Authority.   Each party hereto shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby.

18.6   Entire Agreement.   This Agreement (including the Exhibits hereto) and the agreements described in Section 12.3 hereof set forth the entire agreement of the parties hereto with respect to the transactions contemplated hereby. Any previous agreements or understandings between the parties

regarding the subject matter hereof are merged into and superseded by the foregoing documents.

18.7 <u>California Law to Govern</u>.  This Agreement is being executed and delivered in the State of California and shall be construed and enforced in accordance with the laws thereof.

18.8 <u>Section Headings</u>.  All section headings herein have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.

18.9 <u>Exhibits</u>.  All Exhibits referred to in this Agreement are intended to be and are hereby specifically made a part of this Agreement.

18.10 <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which is an original, and LAT or Authority may become a party hereto by executing a counterpart hereof.  This Agreement and any counterpart so executed shall be deemed to be one and the same instrument. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

18.11   Amendment.  This Agreement may not be amended or modified except by a written instrument executed by all parties hereto.

18.12   Time is of the Essence.   Time is of the essence of this Agreement.

IN WITNESS WHEREOF, Authority and LAT have executed this Agreement on the 31st day of March, 1978.

HOLLYWOOD-BURBANK AIRPORT AUTHORITY,
a public entity constituted pur-
suant to a joint exercise of
powers agreement entered into
by the Cities of Burbank, Glendale
and Pasadena, California

By ___William B. Rudell___
     William B. Rudell
     President of the Commission

ATTEST:

___Carl Meseck___
Carl Meseck
Secretary of the Commission

LOCKHEED AIR TERMINAL, INC.,
a Delaware corporation,

By _____
   David M. Simmons
   President          J.O. Kitchen
                      Pres., Lockheed

ATTEST:

_____
F. R. Jones
Secretary

63

**EXHIBIT B**

EXHIBIT I

AGREEMENT


THIS AGREEMENT is made and entered into as of the 30th day of March, 1978, by and between LOCKHEED CORPORATION, a California corporation ("Lockheed"), and the HOLLYWOOD-BURBANK AIRPORT AUTHORITY, a public entity formed under a joint exercise of powers agreement among the Cities of Burbank, Glendale and Pasadena, California, pursuant to the California joint exercise of powers act ("Authority").


R E C I T A L S

A.  Authority has entered into an Airport Purchase Agreement (the "Purchase Agreement") dated as of March 30, 1978, with Lockheed Air Terminal, Inc., a Delaware corporation ("LAT").  LAT is a wholly-owned subsidiary of Lockheed.


B.  It is a condition to the obligations of Authority under the Purchase Agreement that this Agreement shall have been entered into prior to the closing of the transactions contemplated by the Purchase Agreement.  This Agreement and the undertakings of Lockheed contained herein are material inducements to Authority's performance of its obligations under the Purchase Agreement.


NOW, THEREFORE, in consideration of the benefits to be received by Lockheed by reason of the Purchase Agreement,

and as a material inducement to Authority's performance of its obligations under the Purchase Agreement, it is hereby agreed as follows:

1.   Performance of Purchase Agreement.

     Lockheed shall take, and shall cause all of its subsidiaries to take, any and all actions required to permit LAT to perform all of its agreements and to comply with all conditions to be performed or complied with by LAT under the Purchase Agreement; provided, however, that the agreement of Lockheed under this Section 1 shall not be deemed to be any modification of the conditions precedent to the obligations of LAT as set forth in Section 11 of the Purchase Agreement.

2.   Representations and Warranties.

     Lockheed hereby represents and warrants to Authority that the representations and warranties made by LAT, and Authority hereby represents and warrants to Lockheed that the representations and warranties made by Authority, in the Purchase Agreement or in any list, certificate or document delivered pursuant to the Purchase Agreement are true and correct.

2.

3.   <u>Obligations of Lockheed Prior to Close of Escrow</u>.

Prior to or at the Close of Escrow under the Purchase Agreement, Lockheed shall deliver or cause to be delivered to Authority:

3.1   <u>Officer's Certificate</u>.   A certificate, dated the Close of Escrow and signed by its Chairman of the Board or its President, to the effect that the representations and warranties of Lockheed in this Agreement are true at and as of the time of Close of Escrow as though such representations and warranties are made as of the Close of Escrow; and

3.2   <u>Opinion of Counsel</u>.   An opinion of its counsel, O'Melveny & Myers, Los Angeles, California, dated the Close of Escrow in form and substance satisfactory to Authority to the effect that, assuming due execution and delivery of this Agreement by Authority and that this Agreement is a valid and binding obligation of Authority, this Agreement has been duly executed and delivered by Lockheed and constitutes a valid and binding obligation of Lockheed, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or equitable principles relating to or limiting creditors' rights generally, and except that no opinion need be expressed as to the availability of equitable remedies.

3.

4.   <u>Indemnification</u>.

(a)   Lockheed shall defend, indemnify and save harmless Authority, its members, officers, employees and agents, and the cities of Burbank, Glendale and Pasadena, their officials, employees and agents, against any and all losses, damages, claims, liabilities, obligations, actions, proceedings, costs and expenses, including attorney's fees, which said persons or entities may hereafter suffer, incur, be put to, pay or lay out by reason of (1) any claim, proceeding or investigation arising or alleged to arise out of or be related to the use, ownership or operation of the Airport and Airport Properties prior to the Close of Escrow by LAT, Lockheed or any affiliate of either of them, or (2) the inaccuracy, or the breach by Lockheed of any representation or warranty which Lockheed has made or agreed to hereunder. Nothing contained herein shall require Lockheed to defend, indemnify or save harmless any of the persons or entities identified in this Section 4(a) if such claim, liability, obligation, action or proceeding arises out of or results from acts or omissions of such persons or entities.

(b)   Authority shall defend, indemnify and save harmless Lockheed, its officers, employees and agents, against any and all losses, damages, claims, liabilities,

obligations, actions, proceedings, costs and expenses, including attorneys' fees, which said persons or entities may hereafter suffer, incur, be put to, pay or lay out by reason of (1) any claim, proceeding or investigation arising or alleged to arise out of or be related to the use, owner-ship or operation of the Airport and Airport Properties by Authority after Close of Escrow, or (2) the inaccuracy, or the breach by Authority, of any representation or warranty which Authority has made or agreed to hereunder, but subject in all cases to prior rights of the holders of the Revenue Bonds to be paid pursuant to the terms of the resolution of the Authority authorizing the issuance of the Revenue Bonds. Nothing contained herein shall require Authority to defend, indemnify or save harmless any of the persons or entities identified in this Section 4(b) if such claim, liability, obligation, action or proceeding arises out of or results from (i) acts or omissions of Lockheed, or any officer, employee or agent thereof, including but not limited to acts or omissions of Lockheed under or in connection with any of the agreements described in Section 12.3 of the Purchase Agreement (except as expressly set forth in said agreements), or (ii) the use of the Airport by LAT or Lockheed.

(c)  Authority reserves the right, should it elect to do so, to appoint separate counsel to act as associate

5.

counsel to attorneys selected by Lockheed during the pendency of any claim, proceeding or investigation referred to in Section 4(a) of this Agreement.  In that event, said legal expense of counsel appointed by Authority shall be for the account of Authority.  Any such appointment of separate counsel shall not affect Lockheed's obligations to Authority under Section 4(a).

5.   FURTHER ASSURANCES.

        Each party hereto shall, at its own cost and expense, from time to time, and at the request of the other party (whether such request is made prior to, at or after Close of Escrow), execute and deliver such further instruments of transfer and will take such other reasonable actions, as requested, to confirm the transfer of the Airport Properties pursuant to the Purchase Agreement.  Lockheed's obligation hereunder shall include, but not be limited to, the quitclaim to Authority of any avigation easements that hereafter may be acquired by Lockheed and its affiliates in any manner affecting property owned by persons other than Lockheed and its affiliates and relating to operation of the Airport. Moreover, after Close of Escrow, the parties shall cooperate with one another in allocating to their respective properties and businesses the cost and expenses of any electricity, water, gas and other utilities and service provided to the Airport and its environs that are not separately metered.

6

6. <u>RELOCATION ASSISTANCE BENEFITS</u>.

Lockheed is aware that it or one or more of its subsidiaries could be entitled to relocation assistance benefits under the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 (42 U.S.C. §4601 et. seq.) and the Relocation Assistance Law (California Government Code §7260 et. seq.) in connection with the consummation of the transactions contemplated by the Purchase Agreement. Lockheed represents and warrants that the Purchase Price set forth in the Purchase Agreement includes compensation for any expenses or losses covered by such laws and waives any further rights it or any of its subsidiaries may have under such laws.

7. <u>MISCELLANEOUS PROVISIONS</u>.

7.1 <u>Defined Terms</u>. All defined terms set forth in this Agreement shall have the same meaning as set forth in the Purchase Agreement.

7.2 <u>Notices</u>. All communications, notices and demands of any kind which either party to this Agreement may be required or desire to give to or serve upon the other party,

7.

shall be made in writing, and delivered by personal service to an officer of such other party or sent by telegram or by registered or certified mail, postage paid, return receipt requested to the following addresses:

|  |  |
|---|---|
| To Authority: | Hollywood-Burbank Airport Authority 2627 Hollywood Way Burbank, CA 91505 Attn: Michael R. McClintock |
| With a copy to: | Lillick McHose & Charles 707 Wilshire Boulevard Los Angeles, CA 90017 |
| To Lockheed: | Lockheed Corporation 2555 N. Hollywood Way Burbank, CA 91520 Attn: J. J. Ryan, Secretary |
| With copies to: | Robert C. Gusman, Esq. Bldg. #9 Hollywood-Burbank Airport 2627 No. Hollywood Way Burbank, CA 91520 |
|  | O'Melveny & Myers 611 West Sixth Street Los Angeles, CA 90017 Attn: F. J. Burgweger |

A party may change its address by giving the other party written notice of its new address as herein provided.

7.3  <u>Successors and Assigns</u>.  This Agreement shall be binding upon the successors and assigns of the parties hereto.

8.

7.4   <u>Survival of Representations, Warranties and Covenants</u>.   Except as otherwise provided in this Agreement, all representations, warranties, covenants and agreements of each party set forth in this Agreement or in any schedule, certificate, document or list delivered by any such party shall survive the Close of Escrow.   Notwithstanding any investigation conducted before or after the Close of Escrow or the decision of any party to complete the Close of Escrow, the parties hereto shall be entitled to rely upon the representations and warranties set forth in this Agreement.

7.5   <u>Entire Agreement</u>.   This Agreement sets forth the entire agreement of the parties hereto with respect to the matters covered hereby.   Any previous agreements or understandings between the parties regarding the subject matter hereof are merged into and superseded by this Agreement.

7.6   <u>California Law to Govern</u>.   This Agreement is being executed and delivered in the State of California and shall be construed and enforced in accordance with the laws thereof.

9.

7.7   Section Headings.   All section headings herein have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.

7.8   Counterparts.   This Agreement may be executed in several counterparts, each of which is an original, and Lockheed or Authority may become a party hereto by executing a counterpart hereof.   This Agreement and any counterpart so executed shall be deemed to be one and the same instrument. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

7.9   Amendment.   This Agreement may not be amended or modified except by a written instrument executed by both parties hereto.

7.10   Severability.   If any provision of this Agreement shall be declared unlawful, invalid, void or unen-forceable, the remainder of this Agreement shall not be affected thereby.

IN WITNESS WHEREOF, Authority and LAT have executed this Agreement on March 31, 1978.

                    HOLLYWOOD-BURBANK AIRPORT AUTHORITY, a public entity constituted pursuant to a joint exercise of powers agreement entered into by the Cities of Burbank, Glendale and Pasadena, California

                    By_____
                        William B. Rudell
                        President of the Commission

ATTEST:

_____
     Carl Meseck
     Secretary of the Commission

                    LOCKHEED CORPORATION, a California corporation

                    By_____
                        V. N. Marafino
                        Senior Vice President - Finance

ATTEST:

_____
     Robert C. Gusman
     Corporate Counsel

**EXHIBIT C**

C-1

L E A S E

THIS LEASE executed this 31st day of December, 1980, between the BURBANK-GLENDALE-PASADENA AIRPORT AUTHORITY, a joint exercise of powers between the cities of Burbank, Pasadena, and Glendale, an agency organized and existing under the laws of the State of California, the Lessor, and LOCKHEED PROPERTIES, INC., a California corporation, the Lessee.

W I T N E S S E T H:

Lessor, in consideration of the rent reserved to be paid by the Lessee, and in consideration of the covenants to be kept and performed by the Lessee, does hereby lease and demise to Lessee the following described Airport Authority premises, including any improvements thereon, situated, lying, and being in the City of Burbank, County of Los Angeles, State of California, and commonly identified as:

> Area south of Lessee's Plant C-1 Building Nos. 35 and 40, consisting of approximately 88,060 square feet of land and fences, all as more particularly shown in crosshatching on the drawing attached hereto, marked "Exhibit A," and by this reference made a part hereof as though set forth in full.

The term of this Lease shall commence at 12:01 a.m. on January 1, 1981, (hereinafter the "Commencement Date") and expire on the 30th day of June, 1983; provided, however, that Lessor may terminate this Lease on one hundred eighty (180) days' written notice, subject to the terms and conditions of this Lease, and Lessee paying rent to the Lessor upon the following terms:

The annual rental is Nineteen Thousand Seven Hundred Sixteen Dollars ($19,716.00), payable in monthly installments of One Thousand Six Hundred Forty-Three Dollars ($1,643.00) in advance, on

the first day of each and every month during the lease term or any extensions or renewals thereof. All payments shall be made at the Lessor's office or at such other place and to such other persons as the Lessor may from time to time designate in writing.

It is understood and agreed that the foregoing rental has been calculated on the basis of $ .021    per square foot of paved area and  $ .015    per square foot of unpaved area per month.

Said rental shall be subject to adjustment at the commencement of the third year of the term and every third year thereafter, if applicable, as follows: The base for computing the adjustment is the Consumer Price Index for All Urban Consumers for the Los Angeles-Long Beach-Anaheim Metropolitan Area published by the United States Department of Labor, Bureau of Labor Statistics ("Index"), which is published for the date nearest the commencement of the term ("Beginning Index"). If the Index published nearest the adjustment date ("Extension Index") has changed since the Beginning Index, the rental until the next rent adjustment shall be set by multiplying the rental for the preceding period by a fraction, the numerator of which is the Extension Index and the denominator of which is the Beginning Index. If the Index is changed so that the base year differs from that used for the Beginning Index, the Index shall be converted in accordance with the conversion factor published by the United States Department of Labor, Bureau of Labor Statistics. If the Index is discontinued or revised during the term, such other government index or computation with which it is replaced shall be used in order to obtain substantially the same result as would be obtained if the Index had not been discontinued or revised.

Lessee agrees to keep and observe the following terms, covenants, and agreements:

1.   Lessee shall pay rent as set forth above and such other amounts as may be required herein when due. Should Lessee default in any such payment and should the same remain due and unpaid

- 2 -

sixty (60) days after it shall become due, the Lessor may, at Lessor's option, consider the Lessee a tenant at sufferance and Lessor may exercise any of its options granted to it in Paragraph 9.

2.   Lessee shall pay all charges and expenses for gas, electricity, water, and trash collection used upon and in connection with the premises, and to pay, when due and payable, all taxes and assessments properly levied against Lessee's use or occupancy of the leased premises, save and except Lessee shall, at its cost and expense, have the right to contest by legal proceedings any of the foregoing charges.  In this regard Lessee recognizes and understands that this Lease might be held to create a possessory interest subject to property taxation and that the Lessee might be subject to the payment of property taxes levied on such interest.

3.   Lessee, in its own name and naming Lessor, its officers, agents, employees, and servants, as an additional named insured, shall, during the term of this Lease, maintain and pay the premiums on a policy or policies of comprehensive general liability insurance providing for coverage in the following limits:  A single blanket limit of $100,000,000 per occurrence for bodily injury, personal injury, and property damage for liabilities other than those resulting from use of motor vehicles off the Airport premises and a limit of $10,000,000 for such liabilities.  Certificates of insurance evidencing such insurance will be forwarded to Lessor upon request.  Such certificates will provide thirty (30) days' prior notice to Lessor of cancellation or material change.

Lessor hereby releases Lessee from all liability arising out of loss of or damage to the leased premises caused by perils covered by its fire and extended coverage insurance policies (including, without limitation, any such loss or damage caused by the negligent or wrongful act or failure to act of Lessee, its officers, employees, agents, and/or representatives) and Lessor hereby waives all rights of subrogation of its insurance carriers

- 3 -

in connection with such loss or damage; provided, however, that if the foregoing waiver increases the cost of Lessor's insurance, Lessor may request Lessee to bear such increased cost, and if it declines to do so, this release and waiver shall be cancelled.

4.   Lessee shall not sublet the premises or assign this Lease either in whole or in part without the written consent of Lessor first had and obtained, which consent shall not be unreasonably withheld; provided, however, Lessee may assign and transfer this Lease and all of its rights hereunder without first obtaining Lessor's consent to any affiliated or subsidiary firm or corporation and to any firm or corporation which may succeed to Lessee's business as successor in interest thereof, upon such assignee expressly assuming in writing all obligations of Lessee herein and agreeing in writing to keep and perform all terms, conditions, and covenants to be kept and performed by Lessee hereunder.

5.   Lessee shall use the leased premises only for aircraft assembly activities and such other purposes as Lessor may agree to in writing.  Lessee agrees to use, operate, and maintain the leased premises in conformity with all applicable laws and ordinances of state or local governments and security regulations of agencies of the Federal Government.

6.   Lessee acknowledges and agrees that the premises have been received in tenantable condition and repair, of which the execution of this Lease, and taking possession thereunder shall be inclusive evidence; and that no representations as to the condition of said premises have been made by the Lessor or Lessor's agents. No obligation as to the repairing, adding to, or improving said premises has been assumed by the Lessor; no oral arrangements have been entered into in consideration of making this Lease and that this Lease contains a full statement of the obligation of both parties.

7.   Lessee shall not make any alterations or changes in the premises without the prior written consent of the Lessor, which consent shall not be unreasonably withheld; and all additions and improvements, excluding furniture and fixtures, shall become the

- 4 -

Lessor's property.

8.   Lessor, or Lessor's agent, may at any reasonable time, enter and view the premises, and make necessary repairs for Lessee's account if it should elect to do so, provided, however, Lessor shall obtain Lessee's prior consent, and provided further, Lessee shall have the right to restrict Lessor's inspection of the premises with respect to those areas deemed by Lessee to be proprietary to its business or classified for security reasons under Lessee's military contracts.

9.   If the Lessee shall not pay the rent at the time and in the manner stated, or shall fail to keep and perform any other conditons or agreements on the part of Lessee to be kept and performed, or if the Lessee shall suffer to be filed against Lessee an involuntary petition in bankruptcy or shall be adjudged a voluntary or involuntary bankrupt, or make an assignment for the benefit of creditors, or should there be appointed a Receiver to take charge of the premises, either in the State Court, or in the Federal Court, then, and in any of such events, which continue uncured for sixty (60) days after notice thereof is given to Lessee by Lessor, this Lease will be in default. Lessor shall have the following remedies if Lessee commits a default. These remedies are not exclusive; they are cumulative in addition to any remedies now or later allowed by law, except nothing in this Lease shall be deemed a waiver or modification of Lessee's rights under California Civil Code Sections 1951.2 and 1951.4.

Lessor can continue this Lease in full force and effect, and the Lease will continue in effect as long as Lessor does not terminate Lessee's right to possession, and Lessor shall have the right to collect rent when due.  During the period Lessee is in default, Lessor can enter the premises and relet them, or any part of them, to third parties for Lessee's account.  Lessee shall be liable immediately to Lessor for all costs Lessor incurs in reletting the premises, including, without limitation, reasonable brokers'

- 5 -

commissions, expenses of remodeling the premises required by the
reletting, and like costs. Reletting can be for a period shorter
or longer than the remaining term of this Lease. Lessee shall pay
to Lessor the rent due under this Lease on the dates the rent is due,
less the rent Lessor receives from any reletting. No act by Lessor
allowed by this paragraph shall terminate this Lease unless Lessor
notifies Lessee that Lessor elects to terminate this Lease. After
Lessee's default and for as long as Lessor does not terminate Lessee's
right to possession of the premises, if Lessee obtains Lessor's
consent Lessee shall have the right to assign or sublet its interest
in this Lease, but Lessee shall not be released from liability.
Lessor's consent to a proposed assignment or subletting shall not
be unreasonably withheld.

      Lessor, upon written notice to Lessee, can terminate
Lessee's right to possession of the premises at any time, if Lessee
is in default after the expiration of the sixty (60) day period
set forth above. No act by Lessor other than giving notice to
Lessee shall terminate this Lease. Acts of maintenance, efforts to
relet the premises, or the appointment of a receiver on Lessor's
initiative to protect Lessor's interest under this Lease shall not
constitute a termination of Lessee's right to possession. On termination
Lessor has the right to recover from Lessee:

      (a) The worth, at the time of the award of the unpaid
rent that had been earned at the time of termination of this Lease;

      (b) The worth, at the time of the award of the amount
by which the unpaid rent that would have been earned after the date
of termination of this Lease until the time of award exceeds the
amount of the loss of rent that Lessee proves could have been reasonably
avoided;

      (c) The worth, at the time of the award of the amount
by which the unpaid rent for the balance of the term after the time
of award exceeds the amount of the loss of rent that Lessee proves
could have been reasonably avoided; and

- 6 -

(d)  Any other amount, and court costs, necessary to compensate Lessor for all detriment proximately caused by Lessee's default.

"The worth, at the time of the award," as used in (a) and (b) of this paragraph, is to be computed by allowing interest at the rate of 10 percent per annum. "The worth, at the time of the award," as referred to in (c) of this paragraph, is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus 1 percent.

Nothing contained herein shall relieve or modify the Lessor of its obligation to act reasonably and in a good-faith effort to mitigate damages.

In the event Lessor elects to commence legal action, Lessee shall pay its costs and expenses, including its attorneys fees, as determined by a court of competent jurisdiction.

10.  Lessee, at its own cost and expense, shall maintain and take good care of the leased premises and shall keep them in good repair, condition, and appearance; and, shall make all necessary repairs thereto.  Lessee will, at the expiration or termination of this Lease, remove its property from the leased premises and quietly and peaceably deliver the premises to the Lessor in the same repair and condition in which they are received, ordinary wear and tear and unavoidable casualty excepted.

11.  Lessee shall defend, indemnify and save harmless the Lessor from and against any and all claims, suits, actions, damages arising during the term of this Lease for any personal injury, loss of life, or damage to property sustained in or about the leased premises, by reason or as a result of the Lessee's occupancy thereof, and not resulting from Lessor's negligence, and from and against any orders, judgments, or decrees which may be entered thereon.

12.  Lessor hereby covenants with the Lessee that, upon the performance by the Lessee of all the conditions herein set forth

- 7 -

on the part of the Lessee to be kept and performed, Lessee may quietly have, hold, occupy and use the above-described premises without interruption by the Lessor.

       13.  Notices required under this Lease shall be in writing and may either be delivered personally or by mail as follows:

> Lessor:  The Burbank Airport Authority
>
>           2627 Hollywood Way
>
>           Burbank, California 91505
>
>           Attention:  Deputy Director, Airport Services
>
> Lessee:  Lockheed Properties, Inc.
>
>           2555 Hollywood Way
>
>           Burbank, California 91520

       14.  If all or a portion of the leased premises shall be taken or condemned by any competent authority for any public or quasi-public purpose, this Lease shall terminate as of the date said authority takes possession and Lessor shall be entitled to the entire award.

       15.  Provided Lessee is not in default hereunder, Lessee is hereby given a single right and option to renew the within Lease for a period of three years, upon the same rental, terms, and conditions set forth herein, by giving Lessor prior to the expiration of the term of this Lease at least sixty (60) days' prior written notice of its exercise of such option.

       16.  The following provisions are required by the Federal Aviation Administration policy concerning airport leases and related agreements.

       (a)  The Lessee, for itself, its personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree that (1) no person on the grounds of race, color, or national origin shall be excluded from participation, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the

- 8 -

construction of any improvements on, over, or under such land and the furnishing of services thereon, no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the Lessee shall use the premises in compliance with all other requirements imposed by or pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally-assisted programs of the Department of Transportation-Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations may be amended.

(b)  That in the event of breach of any of the above nondiscrimination covenants, Lessor shall have the right to terminate the Lease, and to re-enter and repossess said land and the facilities thereon, and hold the same as if said Lease had never been made or issued.

(c)  Lessee shall furnish its accommodations and/or services on the premises on a fair, equal and not unjustly discriminatory basis to all users thereof and it shall charge fair, reasonable and not unjustly discriminatory prices for each unit or service; PROVIDED, THAT the Lessee may be allowed to make reasonable and non-discriminatory discounts, rebates or other similar type of price reductions to volume purchasers.

(d)  Non-compliance with the provisions of Subparagraph (c) above shall constitute a material breach thereof and in the event of such non-compliance the Lessor shall have the right to terminate this Lease and the estate hereby created without liability therefor or at the election of the Lessor or the United States either or both said Governments shall have the right to judicially enforce the provisions of Subparagraphs (a), (b) and (c) above.

(e)  Lessee agrees that it shall insert the above four provisions in any lease by which said Lessee grants a right or privilege to any person, firm, or corporation to render accommodations and/or services to the public on the premises herein leased.

- 9 -

(f)  The Lessor reserves the right to further develop or improve the landing area of the Burbank Airport (Airport) as it sees fit, regardless of the desires or view of the Lessee, and without interference or hindrance.

(g)  The Lessor reserves the right, but shall not be obligated to the Lessee, to maintain and keep in repair the landing area of the Airport and all publicly-owned facilities of the Airport, together with the right to direct and control all activities of the Lessee in this regard.

(h)  This Lease shall be subordinate to the provisions and requirements of any existing or future agreement between the Lessor and the United States, relative to the development, operation, or maintenance of the Airport.

(i)  Lessee agrees to comply with the notification and review requirements covered in Part 77 of the Federal Aviation Regulations in the event any future structure or building is planned for the leased premises, or in the event of any planned modification or alteration of any present or future building or structure situated on the leased premises.

(j)  It is understood and agreed that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right within the meaning of Section 308 of the Federal Aviation Act.

(k)  There is hereby reserved to the Lessor, its successors and assigns, for the use and benefit of the public, a right of flight for the passage of aircraft in the airspace above the surface of the premises herein leased.  This public right of flight shall include the right to cause in said airspace any noise inherent in the operation of any aircraft used for navigation or flight through the said airspace or landing at, taking off from, or operation on the Burbank Airport.

- 10 -

(1)  The Lessee by accepting this expressly agrees for itself, its successors and assigns that it will not erect nor permit the erection of any structure or object nor permit the growth of any tree on the land leased hereunder which conflicts with Federal height restrictions and obstruction criteria.  In the event the afore-said covenants are breached, the Lessor reserves the right to enter upon the land leased hereunder and to remove the offending structure or object and cut the offending tree, all of which shall be at the expense of the Lessee.

(m)  The Lessee by accepting this Lease agrees for itself, its successors, and assigns that it will not make use of the leased premises in any manner which might interfere with the landing and taking off of aircraft from the Burbank Airport or otherwise con-stitute a hazard.  In the event the aforesaid covenant is breached, the Lessor reserves the right to enter upon the premises hereby leased and cause the abatement of such interference at the expense of the Lessee.

(n)  This Lease and all the provisions hereof shall be subject to whatever right the United States Government now has or in the future may have or acquire, affecting the control, operation, regulation, and taking over of said airport or the exclusive or non-exclusive use of the airport by the United States during the time of war or national emergency.

IN WITNESS WHEREOF, the parties have hereunto executed this Instrument for the purpose herein expressed, the day and year above written.

BURBANK-GLENDALE-PASADENA
AIRPORT AUTHORITY
                        Lessor

By  William B. Rudell
Its  PRESIDENT

LOCKHEED PROPERTIES, INC.
                        Lessee

By  R. D. Hileman
Its  Corporate Real Estate Director

- 11 -



EXHIBIT A

**EXHIBIT  D**

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE is dated as of August 1, 1986 and entered into by and between Lockheed - California Company, a division of Lockheed Corporation (hereinafter referred to as "Lessee") and Burbank - Glendale - Pasadena Airport Authority a public entity (hereinafter referred to as "Lessor").

WHEREAS, Lessor and Lessee's predecessor in interest, Lockheed Properties Inc., a California Corporation executed a lease dated December 31, 1980 ("Lease") for certain premises ("Premises") consisting of unimproved and paved land adjacent to the Lockheed C-1 plant situated in the City of Burbank, County of Los Angeles, State of California;

WHEREAS, Lessee has succeeded to and assumed the rights and obligations of Lockheed Properties, Inc. under the Lease;

WHEREAS, the Lease term expired on June 30, 1986, however, Lessee has continued by agreement of Lessor, to lease the Premises on the terms and conditions set forth in the Lease, except on a month to month basis; and,

WHEREAS, the parties now desire to amend and supplement the Lease as follows;

NOW, THEREFORE, the parties hereby agree as follows:

1.  The leasehold described as an area south of Lessee's Plant C-1 Building Numbers 35 and 40, consisting of approximately 88,060 square feet of land is reduced to 44,304 square feet of land, and page one of the Lease is hereby amended accordingly.

2.  Exhibit A showing the 88,060 square foot leasehold area is hereby replaced with a new Exhibit A attached hereto and incorporated herein by this reference, showing a 44,304 square feet leasehold.

3.  The monthly rent payable by Lessee upon the date hereof, and for each month thereafter is $995.99.

4.  Except as modified herein, the terms and conditions set forth in the Lease shall remain in full force and effect.


IN WITNESS WHEREOF, this Amendment is executed by the undersigned and shall be deemed to be made effective as of the date first set forth above.


BURBANK - GLENDALE - PASADENA
  AIRPORT AUTHORITY

BY: _____

TITLE: _____

                                        _____
                                        "Witness"


LOCKHEED - CALIFORNIA COMPANY

BY: _____
        G. A. Andres
        Attorney-In-Fact
TITLE: _____

                                        _____
                                        "Witness"



EXHIBIT A
First Amendment to Lease